IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREN L. HOFFMANN, | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | Civil Action No. 20-CV-06427 |
| | : | |
| U.S. CUSTOMS AND BORDER | : | |
| PROTECTION, | : | |
| | : | |
| *Defendant.* | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2022, upon

consideration of defendant U.S. Customs and Border Protection's Motion for Summary

Judgment and any responses thereto, it is hereby ORDERED that defendant's motion is

GRANTED.

It is hereby further ORDERED that judgment is entered in favor of defendant U.S.

Customs and Border Protection and the case is closed.

By the Court:

_____
HONORABLE ANITA B. BRODY
United States District Judge

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREN L. HOFFMANN, | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | Civil Action No. 20-CV-06427 |
| | : | |
| U.S. CUSTOMS AND BORDER | : | |
| PROTECTION, | : | |
| | : | |
| *Defendant.* | : | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, defendant U.S. Customs and Border Protection (CBP or the Agency), by and through undersigned counsel, hereby moves the Court for summary judgment in its favor because the Agency has satisfied its obligations under the Freedom of Information Act, ("FOIA"), 5 U.S.C. § 552.

The CBP has adequately and reasonably responded to plaintiff's FOIA requests, producing responsive material and properly withholding or redacting records in accordance with applicable FOIA exemptions. Accordingly, the Court should grant summary judgment in favor of the CBP. The bases for this motion are set forth in more detail in the attached memorandum of law and accompanying declarations and exhibits.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

 *s/ Gregory B. David   srb*
GREGORY B. DAVID
Chief, Civil Division

*s/ Eric D. Gill*
ERIC D. GILL
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Tel.: (215) 861-8250
Eric.Gill@usdoj.gov

Dated:  July 29, 2022

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREN L. HOFFMANN, | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | Civil Action No. 20-CV-06427 |
| | : | |
| U.S. CUSTOMS AND BORDER | : | |
| PROTECTION, | : | |
| | : | |
| *Defendant.* | : | |

## MEMORANDUM OF LAW IN SUPPORT OF U.S. CUSTOMS AND
## BORDER PROTECTION'S MOTION FOR SUMMARY JUDGMENT

### I.   INTRODUCTION

For the past several years, defendant U.S. Customs and Border Protection (CBP or the Agency) has faced an increased surge of migration through U.S. points of entry (POEs) along the U.S.-Mexico border. In February 2019, plaintiff Karen L. Hoffmann, Esq. submitted a request under the Freedom of Information Act (FOIA) to CBP seeking records related to CBP's processing of migrants at the Eagle Pass Point of Entry in Texas from January 1, 2019 to the date of her request (February 21, 2019). *See* Complt. ¶ 12. Hoffmann also sought interactions that CBP agents had with an individual named Hector Menchaca, the latter of whom Hoffmann believes played a role in the processing of migrants through the Eagle Pass POE. *Id.*

In this action, Hoffman alleges that CBP failed to comply with its FOIA obligations. Hoffman further alleges that CBP's search for records was inadequate and seeks discovery from the Agency. This motion will demonstrate that Hoffman's claims have no basis and that the Court should award summary judgment to CBP and close this case. CBP will show that it: (1) conducted a reasonable, good-faith search with adequate scope and search terms; (2) reviewed

1

the responsive materials in good faith, (3) produced all non-exempt portions of the requested records; and (4) met its burden of segregability. As explained below, and supported by the Agency's Vaughn Index and accompanying declaration, CBP's withholdings fall squarely within the claimed FOIA Exemptions.

Over the course of this litigation, the Agency has worked with Hoffmann to ensure that she received all responsive information. For example, it agreed to manually search cell phones of individuals who had potentially responsive information. When Hoffmann identified a division within CBP that could have responsive information, the Agency checked with that division and produced responsive information. Now, however, because CBP believes it does not have any additional responsive information and because it has met its FOIA obligations, this Court should grant its summary judgment motion and dismiss this matter.

## II.   UNDISPUTED FACTUAL BACKGROUND

### A. Hoffmann's FOIA Request

Hoffmann filed this action on December 20, 2020, seeking relief pursuant to the Freedom of Information Act/FOIA, 5 U.S.C. §§ 552 *et seq*. Previously, on February 21, 2019, Hoffmann submitted a FOIA request for CBP records concerning:

- Correspondence and /or communications between CBP agents/employees and an individual named Hector Menchaca;
- Correspondence and /or communications between CBP agents/employees and the telephone number +52-878-703-2497;
- Communications relating to the capacity of CBP to accept asylum seekers for processing at Eagle Pass Point of Entry (Eagle Pass) from January 1, 2019 to February 21, 2019;
- Communications concerning a list of migrants waiting to present themselves at Eagle Pass from January 1, 2019 to February 21, 2019; and
- Communications concerning migrants detained from January 1, 2019 to February 21, 2019.

*See* Compl. ¶ 12.

2

### B. CBP's Search for Responsive Documents

After receiving Hoffman's FOIA request, CBP's FOIA Division sought responsive information in multiple places. First, CBP determined that U.S. Border Patrol (USBP) was most likely to have responsive information. *See* July 27, 2022 Declaration of Patrick A. Howard (Howard Decl.) ¶ 4, attached as Exhibit 1. Specifically, CBP identified the Del Rio, Texas sector of USBP (the Del Rio Sector) as the most likely source for responsive material because; (1) it was tasked with coordinating and assisting the Eagle Pass Port of Entry due to its proximity to Eagle Pass; and (2) because it possessed the greatest number of assets to deal with the flow of migrants. *Id.* ¶ 6. Because other sectors did not coordinate or administer the Eagle Pass Port of Entry, other sectors were determined to be unlikely to have responsive records. *Id*.

The Del Rio Sector searched the shared drives of offices or personnel[1] most likely to have responsive records with the following keywords/phrases: a) Hector Menchaca; b) +52-878-703-2497; c) capacity; d) asylum; e) Eagle Pass POE; and f) detained in Piedra Negras. *Id.* ¶ 5. The time frame searched was January 1, 2019 to April 2019. *Id.* During the period in question – January 1, 2019 to February 26, 2019 – the Agency exchanged information regarding the flow of migrants through Eagle Pass exclusively via electronic documents; the Del Rio Sector therefore determined that it was unlikely to have paper records responsive to Hoffmann's FOIA request and thus did not search for them. *Id.* ¶ 7. Responsive records were uploaded to an online FOIA database at CBP, reviewed by CBP FOIA personnel, and then produced to Hoffmann. *Id.* ¶ 5.

In addition to the above search, CBP's FOIA division directed OIT's Enterprise Data

---

[1] Computers in Del Rio Sector are networked together and linked to a server with a large, shared storage area referred to as the S: drive or shared drive. Although searches were carried out across the entire Del Rio Sector share drive, files specific to this 2019 mass migration event were stored in S:\DLR013A\GROUPS 2\DRT FOB. The event required a unified response. An incident command post was set up and staffed by various units including member of the Del Rio Sector Intelligence and the Del Rio Sector Foreign Operations Branch.

Management & Engineering Directorate (EDMED) to conduct an email search of all email address mailboxes in the "cbp.dhs.gov" domain. *Id.* ¶ 8. A search was performed across *the more than 76,000* email accounts in that domain for the following keywords/subjects: a) Hector Menchaca; and b) the phone number +52-878-703-2497. *Id.* CBP determined that using these terms to search across all of the Agency email accounts (over 76,000 mailboxes) was the best means to retrieve responsive information without generating an enormous set of records that would be largely unresponsive to Ms. Hoffmann's FOIA request. *Id.* ¶ 9. For example, terms such as "migrants" or "list of migrants", if applied to all of CBP's email accounts, would yield an extremely large number of emails containing that term, the vast majority of which would not be germane of Ms. Hoffmann's FOIA request. *Id.* Even using the smaller set of search terms, the FOIA office still had to sort through many non-responsive pages of e-mail that contained the names "Hector" and "Menchaca," but were not in fact a reference to the individual specified in the FOIA request. *Id.* Responsive records were uploaded to an online FOIA database at CBP, reviewed by CBP FOIA personnel, and then produced to Hoffmann. *Id.* ¶ 8.

In January and February 2021, CBP made two separate productions of responsive information to Hoffmann's FOIA request. *Id.* ¶ 12. CBP produced 443 pages of responsive information to Hoffmann. *Id.* Those productions were made within two months of Hoffmann filing this action. An additional 62 pages were identified as duplicates and a total of 2,210 pages of non-responsive material were not produced, as most of those documents referenced a CBP employee who shares the same name as Mr. Hector Menchaca. *Id.*

### C. Hoffman's Request for WhatsApp Messages

After CBP produced the responsive information described above, Hoffmann was contacted in mid-March 2021 to determine if the production properly satisfied her FOIA request.

4

At this time, for the first time, Hoffmann identified WhatsApp messages sent/received by CBP personnel as information she wished to receive.

CBP uses a mobile device management system named AirWatch to manage the CBP's mobile devices. *See* October 8, 2021 Declaration of John MacNeil ¶ 1 (MacNeil Decl.), attached as Exhibit 2. AirWatch allows CBP's information technology staff to deploy, secure and mange mobile devices, including applications and data. *Id.* ¶ 3. AirWatch can identify applications installed on enrolled devices, but not devices that are not currently enrolled. *Id.* ¶ 5. Thus, if an agency employee receives a new mobile device, AirWatch will be able to verify the applications installed on that device but not the older device that has ceased to be enrolled in AirWatch. Critically, *AirWatch does not have the capability to see or extract data in any installed applications. Id.* ¶ 6 (emphasis added). AirWatch does not have the capability to remotely access the data on mobile devices via the cloud – it can only tell if a device has an application installed. *Id.* Accordingly, to search for responsive information on a CBP agent or employee's mobile device, the phone must be manually reviewed.

Because CBP could not remotely search CBP mobile devices, the Government asked Hoffmann to identify CBP employees whom she believed had responsive information. Hoffmann named two individuals: the Port Director for U.S. Border Patrol Station Eagle Pass (Paul Del Rincon) and the Assistant Port Director (Peter Macias). MacNeil Decl. ¶ 2. Both Del Rincon and Macias had been given new mobile devices on February 7, 2020 and January 6, 2020, respectively. *Id.* ¶ 4. Because CBP could not remotely access Del Rincon or Macias' mobile devices, it arranged to have their CBP mobile devices reviewed in person. On May 5, 2021, Del Rincon's active CBP mobile device was inspected, and no responsive messages were found. June 22, 2021 Declaration of David Garcia ¶¶ 1-2 (Garcia Decl.), attached hereto as Exhibit 3. On

5

May 5, 2021, Macias' active CBP mobile device was inspected, and no responsive messages were found. June 23, 2021 Declaration of Bob B. Parker ¶¶ 1-2 (Parker Decl.), attached hereto as Exhibit 4.

CBP then took additional steps to obtain the non-active mobile devices used by Del Rincon and Macias during the relevant time period of January 1, through February 25, 2019. November 18, 2021 Declaration of Michael McGehee ¶¶ 2-4 (McGehee Decl), attached hereto as Exhibit 5. A visual inspection of Del Rincon's non-active mobile device yielded no responsive messages. *Id.* ¶ 2. The CBP has been unable to recover Macias' non-active mobile device to verify if there is any responsive information. *Id*. ¶ 4. Importantly, a WhatsApp account is linked to a specific phone number. Howard Decl. ¶ 11. The two CBP employees whose Agency mobile phones were manually searched had their old Agency mobile number transferred to their new phones. *Id.* Thus, there would be no difference if a search of the WhatsApp account tied to a specific phone number occurred on a replacement phone with the same number as the messages would still be searchable. *Id*.

### D. Documents Produced from the Office of Field Operations

On November 26, 2021, CBP sent a letter to the Court and to Hoffmann describing its efforts to produce all material that was responsive to the FOIA request and that did not fall within a FOIA exception. Hoffmann replied via letter on December 10, 2021, outlining her disagreements with the Agency's actions. One of the chief issues she raised was that the Agency had not produced any responsive material from a department within CBP -- specifically, the Office of Field Operations (OFO). The Agency reviewed its records and found that a search had been made of OFO but that the documents had not been produced.  Howard Decl. ¶ 13.  The Agency determined that a search was performed on the Laredo Ops Shared Drive, which was

reasonably believed to contain any potential responsive records. *Id*. ¶ 13. On February 24, 2022,

the Agency produced a total of 393 pages of responsive material from OFO to Hoffman which

included Migrant Crisis Action Team (MCAT) daily reports and e-mails. *Id*.

### E. Queue Management Reports and other Document Productions in 2022

Later, Hoffmann requested that the Agency produce queue management reports for some

days that were not produced on February 24, 2022 as part of OFO's first production. *Id*. ¶ 14.

The original search was done manually by an OFO employee searching their email and archives

for reports from the specified dates. *Id*. A subsequent search from CBP's OIT group located the

missing reports, which were produced to plaintiff on July 13, 2022. *Id*.  In addition, on July 26,

2022, a small group of emails were re-produced to Hoffmann, this time without redactions

concerning Hector Menchaca. *Id.* Finally, as Hoffmann is undoubtedly aware since she follows

other FOIA litigation involving CBP, the Agency pointed Hoffmann to the Agency's FOIA

litigation website, which contains publicly-available information regarding "Metering" and

"Migrant Protection Protocols" that may be relevant to her FOIA requests. *Id.* ¶ 15.

### III.   THE STANDARD FOR SUMMARY JUDGMENT IN A FOIA CASE

"Congress enacted FOIA 'to facilitate public access to Government documents,'" and the

statute requires that, generally, agency records be made available to members of the public on

demand. *Manna v. DOJ*, 51 F.3d 1158, 1163 (3d Cir. 1995) (quoting *U.S. Dep't of State v. Ray*,

502 U.S. 164, 173–74 (1991)). The statute was designed to reduce administrative secrecy, *Ray*,

502 U.S. at 173, and there is a general presumption in favor of disclosure. *U.S. Dep't of Air*

*Force v. Rose*, 425 U.S. 352, 360–61 (1976).

"Congress recognized, however, that public disclosure is not always in the public

interest." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985). *Sheet Metal Workers Int'l Ass'n, Local*

*Union 19 v. U.S. Dep't of Veterans Affairs*, 135 F.3d 891, 897 (3d Cir. 1998) (noting that public access to government information is not "all encompassing".) Thus, the FOIA specifically exempts nine categories of records from its broad disclosure requirements. 5 U.S.C. § 552(b). *See U.S. DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). These exemptions are designed "to balance the public's interest in governmental transparency against the 'legitimate governmental and private interests [that] could be harmed by the release of certain types of information.'" *United Techs Corp. v. U.S. Dep't of Defense*, 601 F.3d 557, 559 (D.C. Cir. 2010) (quoting *Critical Mass Energy Project v. Nuclear Reg. Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (*en banc*). *See John Doe Agency v. John Doe Corp*., 493 U.S. 146, 152 (1989) (FOIA is intended to strike "a workable balance between the right of the public to know and the need of the Government to keep information in confidence".) Courts have emphasized that the FOIA exemptions "'are intended to have meaningful reach and application' and should not 'be construed in a nonfunctional way.'" *Manna*, 51 F.3d at 1163, *quoting John Doe Agency*, 493 U.S. at 152, 157.

Summary judgment is appropriate where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Nearly all FOIA cases are resolved on summary judgment. *Lewis v. EPA*, No. CIV.A. 06-2660, 2006 WL 3227787, at *2 (E.D. Pa. Nov. 3, 2006) ("Summary judgment is the primary avenue for resolving a FOIA dispute."); *Brayton v. Office of U.S. Trade Rep.*, 641

F.3d 521, 527 (D.C. Cir. 2011) ("[T]he vast majority of FOIA cases can be resolved on

summary judgment."). Summary judgment is the procedural vehicle by which nearly all

FOIA cases are resolved because "there is rarely any factual dispute . . . only a legal dispute

over how the law is to be applied to the documents at issue." *Gray v. Sw. Airlines Inc.*, 33 F.

App'x 865, 869 n. 1 (9th Cir. 2002).

To succeed on a FOIA claim, a plaintiff must prove that an agency *improperly*

withheld an agency record. *United States v. Tax Analysts*, 492 U.S. 136, 142 (1989). It is the

responsibility of "the agency to justify the withholding of any requested documents" and

"[t]hat burden remains with the agency when it seeks to justify [] redaction[s]." *Ray*, 502

U.S. at 173 (citing 5 U.S.C. § 552(a)(4)(B)). Vague affidavits will not suffice, *Campbell v.

DOJ*, 164 F.3d 20, 30 (D.C. Cir. 1998), and the agency's explanation must be "full and

specific enough to afford the FOIA requester a meaningful opportunity to contest, and the

district court an adequate foundation to review, the soundness of the withholding." *King v.

DOJ*, 830 F.2d 210, 218 (D.C. Cir. 1987).

> The agency can meet its burden by submitting a *Vaughn* index, which is a detailed
> affidavit correlating the withheld documents with the claimed exemptions. To
> pass muster, a *Vaughn* index must consist of one comprehensive document,
> adequately describe each withheld document or redaction, state the exemption
> claimed, and explain why each exemption applies. *Afshar v. U.S. Dep't of State*,
> 702 F.2d 1125, 1144–45 (D.C.Cir.1983) (quoting *Founding Church of
> Scientology, Inc. v. Bell*, 603 F.2d 945, 949 (D.C.Cir.1979)).

*Cozen O'Connor v. U.S. Dep't. of Treas.*, 570 F. Supp. 2d 749, 765 (E.D. Pa. 2008).

An agency can obtain summary judgment in a FOIA case by relying on the submitted

*Vaughn* index or affidavits from agency officials, so long as those materials are "relatively

detailed" and "nonconclusory." *McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983); *see

also Am. Friends Serv. Comm. v. DOD. through Def. Logistics Agency*, 831 F.2d 441 (3d Cir.

9

1987) (quoting *Abbotts v. Nuclear Regulatory Commission*, 766 F.2d 604, 606

(D.C.Cir.1985)) (internal citations omitted) ("'[A]n agency is entitled to summary judgment

if its affidavits describe the withheld information and the justification for withholding with

reasonable specificity, demonstrating a logical connection between the information and the

claimed exemption,* * * and are not controverted by either contrary evidence in the record

nor by evidence of agency bad faith.'").

"'Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it

appears logical or plausible.'" *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)

(quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)). Courts give agency declarations,

including the *Vaughn* index, "a presumption of good faith, which cannot be rebutted by 'purely

speculative claims about the existence and discoverability of other documents.'" *SafeCard*

*Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v.*

*CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)); *see also Samahon v. DOJ*, No. CIV.A. 13-6462, 2015

WL 857358, at *5 (E.D. Pa. Feb. 27, 2015) ("Importantly, the agency enjoys a presumption of

good faith in the submission of these affidavits[.]").

Once the court determines that the responding agency has released all non-exempt,

responsive materials, there is no further judicial function to perform and the FOIA claim is

properly resolved in favor of the agency. *See, e.g.*, *Cause of Action Inst. v. DOJ*, 282 F. Supp. 3d

66, 79–80 (D.D.C. 2017) (granting the agency's motion for summary judgment where the court

had determined that the FOIA requester had received all requested documents less properly

exempted materials). As the District of Columbia Court of Appeals explained, "however fitful or

delayed the release of information under the FOIA may be, once all requested records are

surrendered, federal courts have no further statutory function to perform." *Perry v. Block*, 684

F.2d 121, 125 (D.C. Cir. 1982).

## IV.  CBP PROPERLY CONDUCTED ITS FOIA SEARCH AND PROPERLY WITHHELD OR REDACTED DOCUMENTS IN ACCORDANCE WITH APPLICABLE FOIA EXEMPTIONS

### A.  CBP Conducted an Adequate and Reasonable Search

CBP conducted a reasonable and adequate search by searching: (1) multiple electronic databases within the Agency; (2) more than 76,000 email accounts in the "cbp.dhs.gov" domain; (3) OFO records; and (4) WhatsApp messages of agents who Hoffman identified. Having produced the records to Hoffman after conducting a reasonable search for responsive material to Hoffman's initial and subsequent requests, the CBP believes that there are no additional records responsive to this request; and it has produced all responsive records not exempt from production under FOIA. Howard Decl. ¶ 16.

FOIA mandates that an agency has a duty to conduct a "reasonable" search for records in responding to a FOIA request. *Project on Predatory Lending of the Legal Servs. Ctr. of Harvard Law Sch. v. DOJ*, 325 F. Supp. 3d 638, 657-59 (W.D. Pa. 2018). "[T]he agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested," but "[t]here is no requirement that an agency search every record system." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Moreover, an agency does not have to recreate or reacquire a document it no longer has. *Yeager v. Drug Enforcement Admin.*, 678 F.2d 315, 321 (D.C. Cir. 1982); *see also SafeCard Servs*, 926 F.2d at 1201 ("If the agency is no longer in possession of the document, for a reason that is not itself suspect, then the agency is not improperly withholding that document and the court will not order the agency to take further action in order to produce it.").

The Agency met its burden here. Shortly after receiving the complaint, CBP took the

following actions to gather responsive material in response to Hoffman's FOIA request:

(1) The Search of the USBP Del Rio Sector Shared Drives and CBP Emails
    a. After the CBP's FOIA Division determined that the USBP Del Rio Sector was most likely to have responsive information, the Del Rio Sector searched the shared drives of offices or personnel most likely to have responsive records within the time frame January 1, 2019 to April 2019 with the following keywords/phrases: a) Hector Menchaca; b) +52-878-703-2497; c) capacity; d) asylum; e) Eagle Pass POE; and f) detained in Piedras Negras. Howard Decl. ¶¶ 4-6.
    b. Additionally, CBP's FOIA division directed the email search of *all* email address mailboxes in the "cbp.dhs.gov" domain and a search was performed across all email accounts in that domain for the following keywords/subjects: a) Hector Menchaca; and b) the phone number +52-878-703-2497. *Id*. ¶ 8.
    c. Responsive records were uploaded to an online FOIA database at CBP, reviewed by CBP FOIA personnel, and then produced to Hoffmann. *Id*. ¶ 5.

CBP made two separate productions of responsive information to Hoffmann's FOIA request in January and February 2021 and produced 443 pages of responsive information to Hoffmann. *Id.*

After CBP produced the responsive information described above, Hoffman identified WhatsApp messages sent/received by CBP personnel as information she wished to receive. Hoffmann identified two individuals for the Agency to search: the Port Director for U.S. Border Patrol Station Eagle Pass (Paul Del Rincon) and the Assistant Port Director (Peter Macias). MacNeil Decl. ¶ 2. The CBP took the following actions to gather responsive material in response to Hoffman's subsequent request for WhatsApp messages:

(2) The Search of Agents' WhatsApp Messages
    a. Because CBP could not remotely access Del Rincon or Macias' mobile devices, it arranged to have their CBP mobile devices reviewed in person. On May 5, 2021, Del Rincon's active CBP mobile device was visually inspected, and no responsive messages were found. Garcia Decl. ¶¶ 1-2.
    b. On May 5, 2021, Macias' active CBP mobile device was visually inspected, and no responsive messages were found. Parker Decl. ¶¶ 1-2.
    c. CBP then took additional steps to obtain the non-active mobile devices used by Del Rincon and Macias during the relevant time period of January 1, through February 25, 2019. McGehee Decl. ¶¶ 2-4.
    d. A visual inspection of Del Rincon's non-active mobile device yielded no responsive information. *Id.* ¶ 2.

In December 2021, after the Del Rio search and the WhatsApp searched had been

conducted, Hoffman requested information from the OFO, including queue management reports.

The Agency determined that OFO's files had been previously searched shortly after the FOIA

request was made in February 2019, but that the information was not produced.  Howard Decl. ¶

13.  CBP undertook the following actions to gather responsive material:

    (3) The Search of OFO
           a. A search was performed on the Laredo Ops Shared Drive, which was reasonably believed to contain any potential responsive records. This search identified MCAT daily reports and e-mails. Howard Decl. ¶ 13.
           b. The responsive records from OFO were then reviewed and 393 pages were produced to Ms. Hoffmann on February 24, 2022, withholding 34 pages in their entirety. *Id.*
           c. Hoffmann requested that the Agency produce queue management reports for some days that were not produced on February 24, 2022. The original search was done manually by an OFO employee searching their email and archives for reports from the specified dates. A subsequent search from CBP's OIT group located the missing reports, which were produced to plaintiff on July 13, 2022. *Id.* ¶ 14.  Additional responsive emails were produced on July 26, 2022.  *Id.*

"The court may rely on a 'reasonably detailed affidavit, setting forth the search terms and

the type of search performed, and averring that all files likely to contain responsive materials (if

such records exist) were searched.'" *Mobley v. CIA*, 806 F.3d 568, 580–81 (D.C. Cir. 2015)

(quoting *Oglesby*, 920 F.2d at 68). In order to allow a District Court to determine if an agency's

search was adequate, the affidavit should provide the agency's "rationale for searching certain

locations and not others." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F.Supp.2d 83, 92 (D.D.C.

2009). Furthermore, the "[f]actual assertions in such an affidavit will be accepted as true unless

the requesting party submits evidence contradicting those assertions or rebutting the presumption

that the agency's search was made in good faith*." Cause of Action Inst. v. Internal Revenue

Serv.*, 316 F. Supp. 3d 99 (D.D.C. 2018) (citing *Coffey v. Bureau of Land Mgmt.*, 277 F. Supp.

3d 1, 7 (D.D.C. 2017)).

**1. The Scope of the Agency's Searches Was Adequate**

CBP has provided detailed affidavits describing its good-faith search parameters; and how the search was performed, demonstrating "that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68. CBP met its burden and provided its "rationale for searching certain locations and not others." *Defs. of Wildlife*, 623 F.Supp. at 92. CBP explained it identified the Del Rio Sector as the source for responsive material because; (1) it was tasked with coordinating and assisting the Eagle Pass Port of Entry due to its proximity to Eagle Pass; and (2) because it possessed the greatest number of assets to deal with the flow of migrants. Therefore, the Agency searched the Del Rio Sector. Howard Decl. ¶ 6. Because other sectors did not coordinate or administer the Eagle Pass Port of Entry, CBP determined those other sectors were unlikely to have responsive records and therefore did not search those sectors. *Id*. CBP searched the Del Rio Sectors shared electronic files because during the period in question – January 1, 2019 to February 26, 2019 – the Agency exchanged information about the flow of migrants through Eagle Pass via electronic documents (*i.e.,* emails, Microsoft word documents, electronic reports, etc.). Thus, CBP determined that the Del Rio Sector's shared electronic files would be likely to contain any responsive information. *Id*. ¶ 7. Because responsive records to Hoffmann's request were uniformly electronic records, the Agency did not search for paper records, as it reasonably determined that such a search was unlikely to yield responsive records. *Id*. ¶ 7.

Furthermore, CBP's WhatsApp search of the agents Hoffman identified was reasonably conducted to produce all responsive records without being overly burdensome. [2] The CBP

---

[2] Hoffmann incorrectly asserts that the Agency improperly failed to search Agency mobile telephones to respond to her FOIA request. As the Howard Declaration makes clear, the Agency does not have the ability to remotely search text messages or WhatsApp messages. The text messages for these phones are not under its custody and control. To review text messages would require the Agency to manually review its employee's phones for that purpose. The

14

conducted an in-person review of the active mobile devices of the agents identified by Hoffman and neither inspection uncovered responsive information. Garcia Decl. ¶¶ 1-2; Parker Decl. ¶¶ 1-2. Subsequently, Hoffmann suggested that the Agency's in-person review did not capture all the WhatsApp messages on the phones that were searched because the agents' active phones were not active during the January to February 2019 time period. However, the mobile phone numbers for Del Rincon and Macias did not change when they transitioned from their previous phones that were in use during the relevant time period to their current active phones. Howard Decl. ¶ 11. Thus, any WhatsApp message tied to a specific phone number would be unaffected by the physical replacement of a phone. *Id.* Accordingly, Hoffmann's concerns regarding the adequacy of the search of Agency telephones are without merit.

### 2. The Agency's Search Terms Were Adequate

The search terms employed by CBP in the shared files and email searches were reasonably calculated to uncover all records responsive to Hoffmann's FOIA request. "Agencies generally have 'discretion in crafting a list of search terms' as long as they are 'reasonably tailored to uncover documents responsive to the FOIA request.'" *Tushnet v. U.S. Immig. & Customs Enf't*, 246 F. Supp. 3d 422, 434 (D.D.C. 2017) ((quoting *Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 140–41 (D.D.C. 2015)). Courts will not compel an agency to use a

---

Agency did that for two Agency employees – in consultation with Ms. Hoffmann – and found no responsive records. It would be overly burdensome to do so on a broader basis.

    Furthermore, the fact that the CBP has been unable to recover Macias' non-active mobile device does not render the search inadequate because the WhatsApp messages on the active and non-active device are the same message since the application is tied to a phone number – here, the same number -- and not the physical phone.

    Even if there was relevant uncovered information on the non-active device, which there is not, if an "agency is no longer in possession of the document, for a reason that is not itself suspect, then the agency is not improperly withholding that document and the court will not order the agency to take further action in order to produce it." *SafeCard Servs., Inc.* 26 F.2d at 1201. *See also Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) ("But it is long settled that the failure of an agency to turn up one specific document in its search does not alone render a search inadequate.") Having taken all of the steps within its power to retrieve the non-active phone the CBP fulfilled its burden of conducting a search reasonably calculated to discover the documents requested.

plaintiff's proposed search terms when they are rendered superfluous by the Agency's search terms. *See, e.g.*, *Cause of Action Inst*, 316 F. Supp. 3d at 110 (finding the IRS's decision not to include "Office of White House Counsel" and "White House Office" was reasonable because its search for the term "White House" rendered the two omitted terms superfluous). Moreover, "[w]here an agency's search terms are reasonable, the Court will not second guess the agency regarding whether other search terms might have been superior." *Liberation Newspaper v. U.S. Dep't of State*, 80 F.Supp.3d 137, 146 (D.D.C. 2015). *see also Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the courts should attempt to micromanage the executive branch.").

Here, when comparing the terms from Hoffman's request with the terms used by the CBP "it [] appears more than likely that the terms utilized would identify responsive documents." *Bigwood*, 132 F. Supp. 3d at 141. The Del Rio Sector shared drives were searched for key terms and phrases responsive to all five categories of Hoffman's FOIA request. *See* Howard Decl. ¶¶ 4-5. Hoffman contends the Del Rio Sector shared files search was not calculated to uncover responsive records related to a "list of migrants waiting to present themselves at Eagle Pass" because the search terms did not include a reference to "a list of migrants," however a FOIA requester cannot dictate the precise terms that an agency must use when searching for responsive material. *Mobley*, F.3d at 581. Furthermore, any additional search terms such as "list of migrants" would be superfluous because responsive information to Hoffman's request for a "list of migrants waiting to present themselves at Eagle Pass" would be adequately uncovered by the Agency's search of the terms "Eagle Pass POE" and "detained in Piedras Negras."

The Agency also reasonably limited its email search across more than 76,000 email

16

accounts to the terms "Hector Menchaca" and the phone number +52-878-703-2497. An agency

may limit its search terms to avoid "overbroad result(s)." *Cause of Action Inst*, 316 F. Supp. 3d

at 110 (finding the IRS reasonably decided to exclude the plaintiff's proposed terms "FOIA" and

"consultation" to avoid overbroad results); *see also Tushnet*, 246 F. Supp. 3d 430-31 ("While an

agency's search must be adequate, Congress did not intend to reduce government agencies to

full-time investigators on behalf of requesters."). Here, CBP reasonably determined that these

terms were the best means to retrieve responsive information across tens of thousands of email

accounts without generating an enormous set of records that would be largely unresponsive to

Hoffmann's FOIA request. Howard Decl. ¶ 9. Terms such as "migrants" or "list of migrants," if

applied to all of the Agency's email accounts would yield a huge number of emails containing

that term, and most of them would not be germane to Hoffmann's FOIA request. *Id*. Even using

the smaller set of search terms, the FOIA office still had to sort through many non-responsive

pages of e-mail. *Id*.

### B. CBP Has Performed Its FOIA Duties in Good Faith

"The adequacy inquiry starts with the presumption that the agency affidavits and the

related search were made in good faith." *Cozen O'Connor*, 570 F. Supp. 2d at 766 (*citing Ground

Saucer Watch*, 692 F.2d at 771). So, while the initial burden rests with an agency to demonstrate

the adequacy of its search, once that obligation is satisfied, the agency's position can be rebutted

"only by showing that the agency's search was not made in good faith," *Maynard v. CIA*, 986

F.2d 547, 560 (1st Cir. 1993). To successfully rebut the good faith presumption, the requester

must demonstrate the agency acted in bad faith and present more than purely speculative claims.

*Cozen O'Connor*, 570 F. Supp. 2d at 766. "To merit the presumption of good faith, agency

declarations submitted must be relatively detailed and non-conclusory, and ... submitted in good

17

faith." *Freedom Watch v. Bureau of Land Mgmt.*, 220 F. Supp. 3d 65, 70 (D.D.C. 2016) (citing *SafeCard Services*, 926 F.2d at 1200) (internal quotations omitted).

Here, CBP conducted its search for records responsive to Hoffman's FOIA request in good faith. Indeed, the declarations provided by CBP merit the presumption of good faith as they are sufficiently detailed in their explanation of the Agency's search procedures and provide non-conclusory explanations for their search methods. The Howard Declaration establishes that the Agency conducted its search in good faith, as it explains the Agency's decision to search the Del Rio Sector, provides a rational for the search terms employed, and details how the Agency worked with Hoffman to improve upon its initial search.

Furthermore, the presumption that an agency acted in good faith "can be bolstered by evidence of the agency's efforts to satisfy the request." *Rubman v. U.S. Citizenship & Immigr. Servs.*, 800 F.3d 381, 387 (7th Cir. 2015). An agency's efforts to work with the requester and conduct additional searches and releases suggest a good faith attempt by the agency to adequately respond to the request. *See Meeropol v. Meese*, 790 F.2d 942, 953 (D.C.Cir.1986) ("[A]dditional releases suggest a stronger, rather than a weaker, basis for accepting the integrity of the search....") (internal quotation marks omitted).

CBP's responsiveness to Hoffman's concerns demonstrates that the CBP was acting in good faith. CBP was in communication with Hoffman throughout the search process and expanded its search in response to Hoffman's concerns. After the initial search of the Del Rio Sector, the Agency contacted Hoffman to see if she believed the search satisfied her FOIA request. Hoffman's reply expressed concern that the OFO had not been included in the search. Despite Hoffman not mentioning the OFO until her December 10, 2021 reply, the Agency produced responsive material from OFO on February 24, 2022. As in *Meeropol,* this subsequent

18

production of material suggests a stronger basis for accepting the integrity of the search. *Id.*

CBP further demonstrated its good faith efforts by remaining flexible regarding the phone search. Upon recognition it was not feasible to search a large number of employees' mobile phones, CBP asked Hoffman to identity who she believed could have responsive information and searched those two individuals' phones. CBP then took additional steps to obtain the named agents' inactive phones. McGehee Decl. ¶¶ 2-4.

Furthermore, there is no evidence to undermine CBP's presumption of good faith and the Agency's actions that bolster the presumption. While CBP missed the initial deadline to respond to Hoffman's FOIA request, a delay in responding is not on its own evidence of bad faith. *See Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) (*citing Meeropol 790 F.2d at 952; Ground Saucer Watch*, 692 F.2d at 772 (D.C.Cir.1981)) ("[I]nitial delays in responding to a FOIA request are rarely, if ever, grounds for discrediting later affidavits by the agency."); *see also Cozen O'Connor*, 570 F. Supp. 2d at 768 ("Delays in responding to a request are not, absent evidence of bad faith, grounds for discrediting affidavits."). After the initial delay, CBP undoubtably conducted a good faith search. The Agency demonstrated a willingness to accommodate Hoffman throughout the process and responded to Hoffman's complaint within two months CBP produced two sets of documents totaling 443 pages of responsive information (and also reviewed but did not produce 2,219 pages of non-responsive material). CBP then made a subsequent production of more than 400 pages from the OFO, upon Hoffman's request. Considering that CBP consistently communicated and worked with Hoffman, and made multiple productions to her, there is no reason to question whether the Agency was working in good faith.

For the foregoing reasons, CBP's affidavits should be afforded the presumption of good faith and any allegations of bad faith should be dismissed.

### C. The CBP Properly Withheld Select Information under FOIA

The CBP properly withheld certain information pursuant to three statutory exemptions under FOIA: (1) investigative techniques and procedures (*Id*. § 552(b)(7)(E)); (2) personal privacy (*Id*. § 552(b)(6), (7)(C)); and (3) privileged interagency communications (5 U.S.C. § 552(b)(5)). CBP withheld material pursuant to these exemptions as described in its Vaughn Index.[3] *See generally* Patrick A. Howard Declaration Concerning CBP's Vaughn Index dated July 27, 2022 (Howard/Vaughn Decl.), attached hereto as Exhibit 6 and accompanying Vaughn Index (Exhibit A to Howard/Vaughn Decl.).

### a. Exemption 7(E)

CBP properly invoked FOIA Exemption 7(E) to protect the Agency's techniques regarding staffing, staging areas, capacity, intelligence information, internal tracking, and maps. Such information, if released, could assist individuals seeking to circumvent the law. *See generally* Howard/Vaughn Decl accompanying Vaughn Index.  The Agency claimed this exemption for portions of the following kinds of documents:  Del Rio Incident Command Post Situational Reports (¶ 9); CBP Region VI Executive Summary Updates – Central American Migrant Caravan (¶10); Queue Management Reports (¶11); Migrant Crisis Action Team Reports (¶¶ 12-13); emails between CBP employees (¶¶14-16); and MCAT Daily Reports (¶ 17). The Agency also completely withheld intelligence assessment reports that contained similar information.  *Id.* ¶ 18.

Exemption (b)(7)(E) allows a federal agency to withhold or redact "records or information

---

[3] The Agency is willing to submit documents for *in camera* review if the Court has any questions about the CBP's withholdings. However, while district courts may conduct *in camera* review of the documents at issue, it should be done "only where it is unavoidable." *Senate of P.R. ex rel. Judiciary Comm.*, 823 F.2d 574, 589 (D.C. Cir. 1987) (quoting *Crooker v. ATF*, 789 F.2d 64, 67 (D.C. Cir. 1986). Here, the CBP's Vaughn index and declarations provide a sufficient factual basis for the Court's decision that render an *in camera* review unnecessary.

compiled for law enforcement purposes" to the extent that their release "would disclose techniques and procedures for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E). This exemption is construed literally and "only applies to records that may disclose a technique not commonly known." *Ferri v. Bell*, 645 F.2d 1213, 1223 (3d Cir.1981). Importantly, "Exemption 7(E) sets a relatively low bar for the agency to justify withholding." *Blackwell v. F.B.I.*, 646 F.3d 37, 42 (D.C. Cir. 2011). The agency a "highly specific burden of showing how the law will be circumvented" but rather simply needs to "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C.Cir.2009). "The exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." *Id*.

Exemption 7(E) protects data points that can be compiled as "part of a complex mosaic" with other information "that, if pieced together, would reveal law enforcement techniques, procedures, or guidelines." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.*, 525 F. Supp. 3d 181, 191 (D.D.C. 2021) (citing *Shapiro v. DOJ*, 239 F. Supp. 3d 100, 115-16 (D.D.C. 2017); *see also Whittaker v. DOJ*, 2020 WL 6075681, at *5 (D.D.C. Oct. 15, 2020) (agency properly invoked Exemption 7(E) where it "demonstrated some chance that disclosure of [the withheld information] risks circumvention of the law via a mosaic effect"). In *Citizens for Resp. & Ethics*, DHS properly withheld the number of Secret Service personnel who accompanied President Trump in Scotland. *Id*. at 189. Under the mosaic theory the information was protected because, "the number of Secret Service personnel on a protective trip ... would be

21

one piece of information that could be combined with others to better understand the Secret Service's protective methods and their strengths and weaknesses." *Id.* at 190-91 (citation omitted). Noting the low bar an agency must meet to invoke Exemption 7(E), the Court deferred to DHS's assessment that enabling outsiders to estimate the staffing size of the Secret Service could logically aid individuals seeking to circumvent the law. *Id.* at 190. The Court further recognized "[w]orse, adopting an interpretation of FOIA that requires DHS to disclose this information would imply that DHS will need to release every piece of similar data requested under FOIA, making the Secret Service progressively more vulnerable to circumvention." *Id.*

Here, the CBP withheld staffing, staging areas, and capacity information properly under the mosaic theory, as did DHS in *Citizens for Resp. & Ethics*. *See* Howard/Vaughn Decl. ¶¶ 9-18. Similar to how the Secret Service staffing numbers revealed their protective strength and weaknesses, the information withheld by the CBP would reveal the Agency's strengths and weaknesses at the border. This withheld information could be used by outsiders to overwhelm agents and exploit spots of weaknesses along the border. The data protected by the CBP could be compiled to reveal the Agency's techniques for protecting the border, which would aid individuals seeking to circumvent the law as they could exploit areas that are difficult to staff and locations that are often understaffed. Accordingly, the Court should not disturb the Agency's claimed 7(E) exemption.

### b. Exemption 6 and 7(C)

CBP properly withheld the names and personal identifiable information of government agents and third-party individuals under FOIA Exemption 6. Exemption 6 covers personnel, medical and similar files where disclosure would invade personal privacy. 5 U.S.C.A. § 552(b)(6). The exemption protects "individuals from the injury and embarrassment that can

22

result from the unnecessary disclosure of personal information." *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982).

   "Applicability of the exemption does not depend on the kind of file in which the information is contained. Rather, it covers records that can be identified as applying to a particular individual." *Cozen O'Connor v. U.S. Dep't of Treas.*, 570 F. Supp. 2d 749, 781 (E.D. Pa. 2008) (citing *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982)). Exposing an individual's private and confidential information when the relationship of the information to the individual is not pertinent to the government's workings "serve no legitimate purpose under FOIA sufficient to warrant invading the individual's privacy." *Id*.

Courts will only require an agency to reveal an individual's personal identifiable information if the plaintiff can identify a public interest in disclosure that outweighs the individual's privacy interest. *Id*. (citing *DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 773, 109 S. Ct. 1468, 103 L. Ed. 2d 774 (1989)). Furthermore, "the only relevant 'public interest in disclosure' to be weighed in this balance is the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contributing significantly to public understanding of the operations or activities of the government.'" *U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487 (1994).

There is no public interest in the disclosure of the names and personal identifiable information of government agents and third-party individuals that are simply mentioned in a document. *See Cozen O'Connor* 570 F. Supp. 2d at 782. Here, CBP applied Exemption 6 to personal identifiable information, while reasonably segregating all relevant information from the documents. CBP released all segregable information from these documents and did not redact the name Hector Menchaca from the documents; therefore, there is no public interest in the redacted

information.

Because § 552(b)(7)(C) provides greater protection, our analysis of § 552(b)(6) obviates the need to examine CBP's § 552(b)(7)(C) argument. *See Sheet Metal Workers Int'l Ass'n, Local Union 19* 135 F.3d at 898 ("Because § 552(b)(7)(C) provides greater protection, our analysis of § 552(b)(6) obviates the need to examine the Department of Veterans Affairs's § 552(b)(7)(C) argument."); *Painting Indus. of Hawaii Mkt. Recovery Fund v. U.S. Dep't of Air Force*, 26 F.3d 1479, 1486 (9th Cir. 1994) ("Because we hold that Exemption 6 justifies the government's action in providing redacted copies of certified payroll records requested by the labor organizations, we need not reach the Exception 7(C) issue").

The personal information covered by these exemptions appear throughout the documents. *See* Howard/Vaughn Decl. ¶¶ 9-17 and accompanying Vaughn Index.  This information is routinely withheld, and should be, to protect the privacy interests of Agency employees. Accordingly, the Court should not disturb the Agency's claimed 6 and 7(C) exemption.

### c.  Exemption 5

CBP properly withheld information revealing the agency's deliberative process pursuit to FOIA Exemption 5. Howard/Vaughn Declaration ¶ 9 (discussing Del Rio Command Incident Report).  Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Courts have construed this statutory language to mean that it "exempt[s] those documents, and only those documents that are normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). To be withheld under Exemption 5, "a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards

that would govern litigation against the agency that holds it." *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

First, the withheld materials must meet the inter- or intra-agency threshold requirement. The Supreme Court has determined that "'agency' is means 'each authority of the Government of the United States,' § 551(1), and 'includes any executive department … or other establishment in the executive branch of the government…, or any independent regulatory agency, § 552(f)." *Id*. at 9. The materials withheld by the CBP unquestionably constitute inter- and intra-agency documents.

Once a material has passed that threshold requirement, the agency must establish that the materials in question fall within a privilege against discovery.

> [T]hose privileges include the privilege for attorney work-product and what is sometimes called the "deliberative process" privilege. Work product protects "mental processes of the attorney," *United States v. Nobles*, 422 U.S. 225, 238 * * * (1975), while deliberative process covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," *Sears, Roebuck & Co.*, 421 U.S.[] at 150 * * * (internal quotation marks omitted).

*Id*. at 8.  Exemption 5's deliberative process privilege "permits the government to withhold documents containing 'confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice.'" *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 853 (3d Cir.1995) (quoting *In re Grand Jury*, 821 F.2d 946, 959 (3d Cir.1987)). "It recognizes 'that were agencies forced to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer.'" *Id*. at 854 (quoting *First Eastern Corp. v. Mainwaring*, 21 F.3d 465, 468 (D.C.Cir.1994)). An agency making an exemption under deliberative process "must show that the material sought is pre-decisional and deliberative." *Bayliss v. New Jersey State Police*, 622 Fed. Appx. 182, 185 (3d

Cir. 2015) (quotation omitted).

Here, CBP properly withheld privileged information regarding the deliberative process of agency employees relating to threats to border security operations at and between Ports of Entry as set forth in the Del Rio Command Incident Reports.  Howard/Vaughn Decl. ¶ 9 and Vaughn Index.  These documents contain information about staffing size, photographs of CBP personnel, and operational plans and law enforcement strategies, including maps.  *Id.* They reflect CBP's internal deliberations and are pre-decisional. *Id.* If CBP's internal deliberations related to threats were to be released, the open discussion within the Agency on this important issue would be limited.  The CBP also claims protection under Exemption 7(E) for this material.  Accordingly, the Court should not disturb the Agency's claimed exemptions for this material.

## V.    CONCLUSION

For the foregoing reasons, CBP respectfully requests that the Court grant its summary judgment motion, dismiss the complaint with prejudice, and close this case.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

 *s/ Gregory B. David   srb*
GREGORY B. DAVID
Chief, Civil Division

*s/ Eric D. Gill*
ERIC D. GILL
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Tel.: (215) 861-8250
Eric.Gill@usdoj.gov

Dated:  July 29, 2022

26

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused a true and correct copy of the foregoing Motion for Summary Judgement, which has been electronically filed and is available for viewing and downloading from the Court's ECF system, to be served upon plaintiff via First Class Mail to the following address:

Adam Snyder, Esq.
The Allgood Foundation
60 W. Randolph St., Ste. 400
Chicago, IL 60601
asnyder@kjs-law.com

*Counsel for Plaintiff*

*/s/ Eric D. Gill*
ERIC D. GILL
Assistant United States Attorney

Dated: July 29, 2022