UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREN HOFFMANN, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No.: 2:20-CV-06427 |
| | ) | |
| U.S. CUSTOMS AND BORDER | ) | |
| PROTECTION, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**ORDER GRANTING PLAINTIFF KAREN HOFFMANN'S
MOTION FOR SUMMARY JUDGMENT**

---

AND NOW, this _____ day of _____, 2022, upon consideration of Plaintiff Karen Hoffmann's Motion for Summary Judgment and any responses thereto, it is hereby ORDERED that plaintiff's motion is GRANTED.

It is hereby further ORDERED that judgment is entered in favor of Plaintiff Karen Hoffmann and against Defendant U.S. Customs and Border Protection.

By the Court:

_____
HONORABLE ANITA B. BRODY
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREN HOFFMANN, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No.: 2:20-CV-06427 |
| | ) | |
| U.S. CUSTOMS AND BORDER | ) | |
| PROTECTION, | ) | |
| | ) | |
| *Defendant.* | ) | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, plaintiff Karen Hoffman, by and through undersigned counsel, hereby moves the Court for summary judgment in its favor because the defendant Customs and Border Patrol has failed to satisfy its obligations under the Freedom of Information Act, ("FOIA"), 5 U.S.C. § 552.

CBP has not adequately and reasonably responded to plaintiff's FOIA requests, has failed to produce responsive material, failed to conduct a reasonable and adequate search, and has improperly withheld and redacted records contrary to applicable FOIA exemptions. Accordingly, the Court should grant summary judgment in favor of the Plaintiff. The bases for this motion are set forth in more detail in the attached memorandum of law and accompanying declarations and exhibits.

Submitted this 26th day of August, 2022.

Respectfully,

_____

ADAM SNYDER
THE **ALLGOOD** FOUNDATION
*Counsel for Plaintiff*
The Goodman Theater Building
60 W. Randolph St., Suite 400
Chicago, Illinois 60601
asnyder@kjs-law.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

KAREN HOFFMANN,                      )
                                     )
              Plaintiff              )
                                     )
       v.                            )        Case No. 2:20-cv-06427-AB
                                     )
U.S. CUSTOMS AND BORDER              )
PROTECTION,                          )
                                     )
              Defendant.             )

---

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff, through counsel, respectfully submits this Memorandum of Law in support of her Cross-Motion for Summary Judgment.

## I.    FACTS AND PROCEDURAL BACKGROUND

To aid the Court's review of the adequacy of CBP's search, the propriety of its withholdings, and its claim of entitlement to the presumption of good faith, Plaintiff offers a brief summary of the factual context surrounding her request and CBP's unlawful actions that prompted them.

### A.  The Parties.

Plaintiff is a Philadelphia-based immigration lawyer. She provides legal advice and representation to parents and children fleeing persecution and torture as they seek humanitarian protections, including asylum, in the United States. She assists asylum seekers and their counsel in litigation to enforce their rights and ensure the U.S. government honors its obligations to them under U.S. and international laws. *See Herrera-Reyes v. Attorney General*, 952 F.3d 101 (3d Cir. 2020). Her team received the 2019 Pro Bono Award from the U.S. District Court for the Northern District of Illinois

1

for litigation to reunite families separated at the U.S.-Mexico border. *W.S.R. v. Sessions*, 318 F. Supp. 3d 1116 (N.D. Ill. 2018).

Defendant U.S. Customs and Border Protection (CBP) is the executive agency primarily responsible for facilitating migrants' access and initiating their claims for asylum and related fear-based legal protections at and between U.S. POEs. *Al Otro Lado, Inc. v. Mayorkas*, 2021 WL 3931890 *1 n.4 No. 17-CV-02366-BAS-KSC, (S.D. Cal. Sept. 2, 2021) (citing a joint statement of undisputed material facts (JSUF) CBP and AOL filed supporting their cross-motions for summary judgment). CBP's Office of Field Operations (OFO) manages operations, including asylum processing, at POEs. *Id.* (citing JSUF ¶ 4).

### B. CBP's Unlawful Asylum Turnback Policies.

Beginning November 10, 2016, CBP formally began using so-called "Metering" and "Queue Management" practices based on what the agency claimed were capacity limitations at its POEs. *Id.* at *3-4 (citing JSUF ¶¶ 228, 238). CBP's "'turnbacks' involved a combination of CBP officers (1) coordinating with Mexican immigration officials to 'control the flow' of migrants seeking asylum before they reached the border and (2) affirmatively turning asylum seekers away from the border when Mexican immigration officials did not control the flow." *AOL*, 2021 WL 3931890, at *9. In addition, CBP officers instructed asylum seekers to leave POEs and "coordinate with Mexican immigration officials to put their name on a list . . . and spend additional time in Mexico waiting for their 'appointments.'" *Id.* at *17.

In December 2018, Plaintiff traveled to Tijuana, Baja California, Mexico to volunteer with transnational legal non-profit Al Otro Lado (AOL). While there, she assisted AOL in counseling the thousands of asylum seekers stranded in Mexico as a result of U.S. border policies cutting off asylum

access at Ports of Entry (POEs).[1] She visited emergency shelters to provide legal orientation and screening, documented repressive tactics employed against asylum seekers by U.S. and Mexican law enforcement officials, and witnessed firsthand the human toll of cutting off access to legal protections. She also provided legal accompaniment for asylum seekers attempting to present their claims at POEs.

On October 27, 2020, the Department of Homeland Security (DHS) Office of Inspector General (OIG) published findings that DHS and CBP "took several actions to limit the number of" asylum seekers processed at POEs.[2] Specifically, OIG investigators found (1) DHS urged asylum seekers to come to POEs, but reassigned staff away from asylum processing, (2) CBP stopped routine processing of most asylum seekers at seven POEs, instead redirecting them elsewhere, (3) CBP returned asylum seekers to Mexico even after they were on U.S. soil, and (4) CBP did not use all the detention space it had available while claiming capacity limitations prevented asylum processing. OIG Turnbacks Report at 2, 6. DHS-OIG noted AOL's ongoing legal challenge to these policies, and accordingly, declined to take a position on their legality. OIG Turnbacks Report at 6. CBP refused OIG's recommendation that it resume processing asylum claims at the seven ports of entry. *Id.* at 21.

As AOL eventually proved in court, CBP's metering and queue management policies had the effect of unlawfully turning back asylum-seekers and interfering with their legally protected rights under the Immigration and Nationality Act (INA), Administrative Procedure Act (APA), *id.* at *18, and Due Process Clause of the Fifth Amendment to present their claims upon arrival at POEs along the U.S.-Mexico border. *Id.* at *20. The court in *AOL* noted CBP's persistent claims that it could not process asylum seekers at POEs because the agency lacked capacity to do so. *Id.* at *3 ("[CBP officials]

---

[1] *See generally* "The Out Crowd," This American Life Ep. 688 (Nov. 15, 2019) *available at* https://www.thisamericanlife.org/688/transcript (last visited Aug. 26, 2022).
[2] Joseph V. Cuffari, Ph.D, Inspector General, "CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry," OIG-21-02 (Oct. 27, 2020) *available at* https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-02-Oct20.pdf (last visited Aug. 26, 2022) (hereinafter the "OIG Turnbacks Report").

may elect to meter the flow of travelers at the land border to take into account the port's processing capacity") (quoting JSUF ¶ 228); *id. at* *3 ("Thus, according to Nielsen, ports could process asylum seekers to the extent their capacity would allow 'without negatively impacting their other responsibilities'") (citing JSUF ¶ 245); *id.* at *3 ("Port officials subsequently began to use 'operational capacity' instead of 'detention capacity' to determine when to employ metering at their respective POEs") (citing JSUF ¶ 50). But, as the court noted, "operational capacity" was a term CBP did not officially define in its written policy and procedure documents. *Id.* at *3 (citing JSUF ¶ 251). Moreover, at the same time CBP instituted its metering policy based on a lack of capacity, it scrapped or stalled plans already in the works to increase capacity. *Id.* at *2 (citing JSUF ¶¶ 116, 121-22, 125-26, 129).

On November 1, 2021, CBP formally rescinded its unlawful metering policies.[3] On August 5, 2022, Judge Brashant converted the preliminary injunction in *AOL v. Mayorkas* into a permanent one. No. 3:17-cv-02366-BAS-KSC, 2022 WL 3135914 (S.D. Cal. Aug 5, 2022).

## C. CBP Applied Its Unlawful Turnback Policies at the Eagle Pass POE in February 2019.

From January to early February 2019, "a group of approximately 2,000" mostly Central American migrants–including hundreds of children–traveled together through Mexico en route to the United States. As more fully described by an article about the records CBP released in this case, published in *The Intercept* in March 2022, the consequences of metering were disastrous and deadly. *See* John Washington & Jose Olivares, "Internal CBP Documents Detail 'Transnational Effort to Shut Down Asylum'", The Intercept (Mar. 22, 2022) *available at* https://theintercept.com/2022/03/22/cbp-asylum-mexico-piedras-negras/. "Controlled metering of small groups, up to 25 migrants, will continue via B2 by mutual agreement of CBP, INM [the

---

[3] *See* Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry, Acting CBP Commissions Troy A. Miller, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf (last visited Aug. 26, 2022).

Mexican Immigration enforcement agency], and City of Piedras Negras Officials." *Id.* (linking to CBP_2021_2_00047 *available at* https://www.documentcloud.org/documents/21473070-2a-cbp_2021_2_00001-391-processed-february-14-2019-region-vi-executive-summmary-update.) This agreement occurred despite the fact that CBP records released to Plaintiff show the agency knew on February 7, 2019, that the Coahuila State Human Rights Commission "reminded officials that it is illegal to hold migrants against their will for more than 48 hours", *see* CBP_2022_2_00040, *available at* https://www.documentcloud.org/documents/21473092-february-7-2019-cbp-intel-email-update-33.

### D. Plaintiff's FOIA Request & CBP's Responses

On February 21, 2019, Plaintiff filed the five-part request at issue in this case. ECF 1, Compl. ¶ 2; ECF 12, Answer ¶ 2. In April 2019, Plaintiff appealed CBP's failure to respond to her request. ECF 1 ¶ 3; ECF 12, ¶ 3. On December 22, 2020, after receiving no response from the agency for 22 months, Plaintiff filed the Complaint initiating the instant action. Hoffmann Decl, ¶¶ 4, 10.

CBP began record productions in January and completed them in February 2021. On April 4, 2021, Plaintiff received an email from CBP's counsel stating: "the agency has completed its response to your request." Hoffmann Decl. ¶ 11. On July 2, 2021, agency counsel again stated via email that "the Agency has produced all non-privileged responsive documents." *Id.* ¶ 12.

CBP admitted in its Answer, filed August 4, 2021, that "as of the time that Hoffman [sic] filed her Complaint defendant CBP had not yet produced responsive, non-privileged materials." ECF 12, Answer, at ¶ 4. CBP further claimed it "has produced all responsive, non-privileged documents to Hoffman [sic]." *Id.* ¶ 24.

The September 16, 2021, Joint Discovery Plan filed with the Court states on page 3 that "[t]he Agency has produced all responsive, non-privileged documents in its possession and control." ECF 14. Accordingly, on September 24, 2021, this Court ordered CBP to produce affidavits supporting

these claims by no later than October 15, 2021. ECF 16. On the day its affidavits were due, CBP sought and received an additional two weeks to comply. ECF 17, 18.

On October 29, 2021, the agency sought and received a second two-week extension, until November 15. ECF 19. On November 15, 2021, the agency sought and received a third extension of time to produce affidavits supporting its claims. ECF 20. CBP finally produced the required declarations on November 26, 2021–two months after the Court's original deadline.

Relying almost exclusively on CBP FOIA Branch Chief Patrick Howard's declaration, on November 26, 2021, CBP once again advised Plaintiff and the Court that it had "produced all responsive, non-privileged, documents in its possession and control." *Id.* ¶ 18. *See also* Exh. 1 Nov. 26, 2021 DOJ Ltr to Court. In a December 10, 2021 letter to this Court, Plaintiff pointed out numerous deficiencies in the agency's search and production. *Id.* ¶ 19. *See also* Exh. 2 Dec. 10, 2021 Pl. Ltr to Court. In response, on February 24, 2022, CBP produced hundreds of pages of new records responsive to Plaintiff's original request, undercutting the agency's repeated claims of having produced all responsive documents. *Id.* ¶ 20.

The Court set a status conference for December 14, 2021. ECF 21. During this conference, ECF 23, CBP, through counsel, represented once again that the agency's searches were adequate, its productions were complete, and that it had released all reasonably segregable, non-exempt materials responsive to Ms. Hoffmann's request. As would soon become obvious, this was untrue.

CBP offered no substantive, written response to Plaintiff's December letter objecting to CBP's search and productions. Instead, it told the Court it intended to seek summary judgment. Eventually, however, the agency's counsel agreed to consider Plaintiff's objections, and the Court set another status conference for March 9, 2022. ECF 23.

In February 2022, after repeatedly telling Plaintiff and the Court it had produced all responsive records, including in a sworn statement from Mr. Howard dated November 16, 2021, CBP implicitly

admitted this was incorrect and nearly doubled its volume of production–adding 393 pages to the 443 it produced during January and February 2021. ECF 35-1, Howard Decl. ¶ 13.

This Court held a second status conference on March 9, 2022. ECF 28. Ms. Hoffmann, now represented by counsel, informed CBP and the Court during the March 9 conference of the numerous outstanding deficiencies in the agency's production, including gaps in its most recent releases. Hoffmann Decl. ¶ 21. The Court set a status conference for April 19, 2022, in chambers, to seek resolution of any outstanding issues identified by the parties after conferral. ECF 28.

Despite getting no response from CBP to her prior letter, Plaintiff provided her written position to CBP's counsel on March 18, 2022. Exh. 3 Pl's March 18, 2022 Ltr. to Def. & Attachments thereto. In an April telephone conference, CBP's counsel indicated that it would soon provide Plaintiff with missing records and respond to her deficiency letters. Hoffmann Decl. ¶ 22. CBP's Counsel indicated the need to review CBP's new productions and confer with the agency's lawyers about next steps. Between April 8 to May 9, 2022, Plaintiff's counsel inquired four times about CBP's promised production. *Id.* ¶¶ 25-30. CBP repeatedly claimed to need only a little more time to fulfill its obligations. *Id.* It never did. Instead, in a May 19, 2022 letter, CBP's counsel stated that the agency would seek summary judgment as further investigation was too burdensome and, contrarily, that the missing records would be produced at some undetermined future point. *Id.* ¶ 31. In the meantime, the status conferences this Court set and adjusted based on CBP's representations that it would work with Plaintiff to narrow the issues were postponed, then canceled, at CBP's request. ECF 30, 32.

This Court set a briefing schedule on May 26, 2022, requiring CBP to file its summary judgment materials by July 15, 2022. ECF 31. That schedule would have concluded briefing no later than August 25, 2022. *Id.* On the day its materials were due, CBP sought and received a two-week extension of time to file its brief. ECF 33, 34. CBP filed its motion and supporting materials on July 29, 2022. ECF 35.

Plaintiff includes this (admittedly) painstaking recitation of procedural history because she anticipates that upon reviewing this Motion, CBP will discover it once again needs more time to respond. The agency may even offer to task additional searches or re-release certain materials as a means to avoid judgment. This Court should view any such requests in light of the agency's track record.

## II.    LEGAL STANDARD

The Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if "it might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.* In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has met its initial burden, the nonmoving party must then "make a sufficient showing to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

"FOIA cases are typically resolved on a motion for summary judgment." *New Orleans Workers' Ctr. for Racial Justice v. Immigration & Customs Enforcement*, 373 F. Supp. 3d 16, 30 (D.D.C. 2019) (quotation omitted). "FOIA requires federal agencies to disclose, upon request, broad classes of agency records unless the records are covered by the statute's exemptions." *Id.* (quoting *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001). The agency has the burden of proving its search was reasonable. *Manatt v. Dep't of Homeland Security*, 473 F. Supp. 3d 409, 416 (E.D. Pa. 2020).

"However, the burden upon the requester is merely to establish the absence of material factual issues before a summary judgment disposition of the case could possibly occur." *New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 31 (quoting *Public Citizen Health Research Group v. FDA*, 185 F.3d 898, 904-05 (D.C. Cir. 1999)).  Thus, where a FOIA requester demonstrates the absence of any genuine issue of material fact regarding the agency's actions–whether as to search adequacy, withholdings, or segregability–the requester is entitled to summary judgment. *See, e.g.*, *New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 49 (granting requestor summary judgment where ICE failed to search additional locations identified by plaintiff, failed to adequately search databases, and failed to produce responsive email attachments); *Prison Legal News v. Lappin*, 603 F. Supp. 2d 124, 128 (D.D.C. 2009) (granting requester's summary judgment where agency affidavit failed to claim production of all responsive records).

## III.    ARGUMENT

### A.    Plaintiff is Entitled to Judgment as a Matter of Law That CBP Conducted an Inadequate Search.

"Under FOIA, the agency has a duty to conduct a reasonable search for responsive records." *Abdelfattah v. DHS*, 488 F.3d 178, 182 (3d Cir. 2017). "To demonstrate the adequacy of its search, the agency should provide a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched." *Id.* (internal quotations omitted). The agency bears the burden of showing "beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents." *Wadhwa v. Dep't of Veteran Affairs*, No. 11-171 at *6 (3d Cir 2011) (quoting *Weisberg v. Dep't of Justice*, 705 F. 2d 1344, 1351 (D.C. Cir. 1983)). *Accord Abdelfattah*, 488 F.3d at 182 (citing *Valencia-Lucena v. Coast Guard*, 180 F. 3d 321 (D.C. Cir. 1999) as the standard for evaluating the sufficiency of agency affidavits in establishing search adequacy). Because "the fundamental principle animating FOIA is public access to government documents," agencies responding to FOIA requests must "make more than

perfunctory searches and, indeed, follow through on obvious leads to discover requested documents." *Valencia-Lucena*, 180 F.3d at 325. The agency "cannot limit its search" to one or more places if there are additional sources that are likely to turn up the information requested. *Id.* (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). In this case, there is no genuine dispute of material fact as to the inadequacy of CBP's search for multiple reasons, outlined in detail below.

> 1. **CBP's Decision to Only Search Custodians and Systems of Records It Deemed 'Most Likely' To Possess Responsive Records Was Unreasonable and Inadequate as a Matter of Law.**

The Act requires agencies to search "all files likely to contain responsive information." *Abdelfattah*, 488 F.3d at 182. CBP admits it did not conduct such a search. "[A] search of the systems 'most likely' to contain responsive records does not satisfy FOIA, because systems that are not 'most likely' to contain documents may still be likely to contain responsive documents." *Conway v. Agency for Int'l Development*, 99 F. Supp. 3d 171, 178 (D.D.C. 2015). The Howard Declaration both fails to aver that CBP searched all files likely to contain responsive materials *and* admits that CBP purportedly limited its search to only those locations it deemed "most likely" to contain responsive records. ECF 35-1 ¶ 3. As explained more fully in Plaintiffs' Response in opposition to CBP's motion for summary judgment, the combination of this omission and sworn admission by Mr. Howard establishes the inadequacy of the agency's search as a matter of law. *See* ECF 36 at 6-9 and accompanying citations. Plaintiff is entitled to judgment as a matter of law based on CBP and Mr. Howard's past disregard for the All-Files averment requirement in *Sabra v. CBP* and *Davis Wright Tremaine LLP v. CBP*, ECF 36 at 7, in tandem with the agency's admitted, ongoing, unlawful practice of only searching "most likely" files, ECF 35-1 ¶ 3.

2. **CBP's Decision Not To Task the MCAT with a Search, Where Obvious Leads Emerged During the Process and the Agency's Judicial Admissions in *AOL v. Mayorkas* Identify MCAT as a Likely Custodian, Renders Its Search Inadequate as a Matter of Law.**

Second, the agency's search was inadequate as a matter of law because Mr. Howard admits CBP failed to task multiple offices and individuals the agency itself knew or should have known were likely to possess responsive records. In *AOL v. Mayorkas*, CBP explained that in "October 2016, the CBP Commissioner established a Migrant Crisis Action Team ("MCAT"), which was composed of various CBP and DHS components headed by Border Patrol's Deputy Chief. (JSUF ¶¶ 117–18.) The MCAT reported on DHS-coordinated plans 'for addressing the surge of migration along the Southwest border.'" (JSUF ¶ 120.). 2021 WL 3931890 *3 n.6. Here, CBP admits in the Howard Declaration that it did not search any MCAT custodians, instead limiting its search to the Del Rio Sector, Laredo Field Office and an enterprise-wide email search. ECF 35-1 ¶¶ 6, 8. This, despite acknowledging the MCAT as an originating source for responsive documents. ECF 35-1 ¶ 13 (describing a search of the OFO Laredo Ops Shared Drive that "identified MCAT daily reports and emails"). Mr. Howard thus admits that CBP did not follow through on this "obvious lead," which, based on the agency's submissions in *AOL v. Mayorkas* and the records produced to date, could reasonably be expected to return responsive documents. This admitted failure constitutes a FOIA violation and entitles Plaintiff to judgment as a matter of law. *Valencia-Lucena v. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999).

3. **CBP's Decision Not to Search *Any* Cell Phone Records, Text Messages, or Call Logs in Response to a FOIA Request Seeking Communications with a Specific Phone Number Is Unreasonable and Inadequate As a Matter of Law.**

More troubling, but no less relevant to Plaintiff's entitlement to summary judgment, is the fact that the agency failed to search for text messages or telephone call logs in response to a FOIA request for communications with a specific telephone number. In this respect, the multiple declarations CBP

11

offers to explain the absence of WhatsApp messages (but not, alas, the missing Samsung telephone of Assistant Port Director Pete Macias, *see* ECF 35-5, McGehee Decl. ¶ 4) might lose the forest for the trees. On April 9, 2021, Plaintiff informed CBP's counsel that Mr. Macias would have communicated with Hector Menchaca about the metering list in Piedras Negras "almost daily." Exh. 4 - Apr. 9 Email from Hoffmann to Gill. In the body of her email, she included a link to an April 2019 report by Human Rights First recounting firsthand observations of CBP's communications with the "list manager." *Id.*[4] The report states, and Plaintiff's email highlights, that "CBP officers on these bridges contacted the private businessperson who serves as the link between the municipal government of Piedras Negras and U.S. immigration officers by telephone, ***often*** using WhatsApp[.]"

"Often" does not mean "always." So it is possible, based on these eyewitness accounts, that Assistant Port Director Macias, Port Director Del Rincon, and other individuals in the Eagle Pass POE exchanged calls or text messages with Menchaca that would be responsive to Plaintiff's request, even if they were not sent via WhatsApp. In other words, CBP has had this "obvious lead" since at least April 2019. What did CBP do with this information? According to CBP's declarations, the only answer this Court can reach is "nothing." *See* ECF 35-4, Garcia Decl. ¶ 2 (describing a visual inspection of Mr. Del Rincon's phone that did not include any search for "Menchaca" in the contacts list or the requested telephone number in the call logs or text messages); ECF 35-4, Parker Decl. ¶ 2 (describing a visual inspection of Mr. Macias's iPhone XR that did not include any search for "Menchaca" in the contacts list or the requested telephone number in the call logs or text messages).

---

[4] *See* Barred at the Border: Wait 'Lists' Leave Asylum Seekers in Peril at Texas Ports of Entry, Human Rights First (April 2019) *available at* https://www.humanrightsfirst.org/sites/default/files/BARRED_AT_THE_BORDER.pdf (last visited Aug. 26, 2022).

What does CBP tell the Court about this? First, Howard says CBP cannot search remotely. ECF 35-1 ¶11 ("Any search of an agency employee's mobile phone would have to be done manually, by personally reviewing that employee's phone. I understand that two agency employee's phones were reviewed in this manner in connection with Ms. Hoffmann's FOIA request."). When? By whom? Using what methodology? None of CBP's declarants can say. If CBP completed a manual search of Del Rincon and Macias's cell phones, why can the officials who describe their WhatsApp reviews not attest to that? If the search was performed by other officials, why did they not search for WhatsApp messages in their initial tasking? Was Assistant Port Director Macias's now-missing Samsung device searched?

CBP's unexplained failure to describe with reasonable specificity searches of cell phone information *other than* WhatsApp messages in response to a FOIA request seeking communications between its individuals and a specific telephone number is unreasonable as a matter of law. "The adequacy of a FOIA search is generally determined by the appropriateness of the methods used to carry out the search." *James v. CBP*, 549 F. Supp. 2d 1, 8 (D.D.C. 2008) (quoting *Iturralde*, 315 F.3d at 315) (cleaned up). Like tasking a search for emails in response to a FOIA request seeking faxes would be *per se* unreasonable because the method of search would be inappropriate *ab initio*; like tasking a search that looked only at agency cell phones in response to a FOIA request seeking emails; so, too, here. Seeking apples when you're under a legal duty to find oranges is not a reasonable means of faithfully discharging that duty.

Plaintiff raised this issue with CBP in writing in December 2021:

First, in response to a FOIA request that included records of communications with a telephone number, it appears CBP initially searched *no* phones and *no* phone records. Howard doesn't even specify what offices at CBP would hold such records and in what form they might be stored. Refusing without explanation to conduct a search of phone records in response to a FOIA request for communications with a specific phone number cannot possibly constitute a search reasonably calculated to uncover all responsive records. Indeed, it seems calculated to do just the opposite by eliminating the most likely category of responsive records from the initial search.

Exh. 2 at 7. What has CBP done since Plaintiff raised this objection to clarify its actions? According to Mr. Howard, the answer is "nothing." ECF 35-1. In the 1,250 days between receiving Plaintiff's FOIA and filing its motion for summary judgment alleging it conducted an adequate search, CBP admits it has never tasked a search of any official's cell phone beyond opening the phone, looking for WhatsApp, and closing it again. Nor does the agency explain this choice. On this record, no genuine dispute of material fact exists that the agency's search for communications between Hector Menchaca's cell phone number and CBP officials is unreasonable as a matter of law. Plaintiff is therefore entitled to summary judgment and injunctive relief.

### 4. CBP's Search Terms Were Unreasonable As a Matter of Law.

Plaintiff is entitled to judgment as a matter of law that CBP's search was unreasonable and inadequate because the six terms CBP chose, ECF 35-1 ¶ 5, violate the agency's obligations under the Act. "[A]n agency is not permitted to deny requestors information by narrowing the scope of its search to exclude relevant information." *Nat'l Security Counselors v. CIA*, 849 F. Supp. 2d 6, 12 (D.D.C. 2012). CBP was under a duty to construe Plaintiff's FOIA request liberally. *See Truitt v. Dep't of State*, 897 F.2d 540, 544-55 (D.C. Cir. 1990); *Church of Scientology v. NSA*, 610 F.2d 824, 836-37 (D.C. Cir. 1979). Mr. Howard admits under oath that CBP did not honor this duty. ECF 35-1 ¶¶ 5, 9.

Mr. Howard tells this Court, under oath, that "terms such as 'migrants' or 'list of migrants', if applied to all of CBP's email accounts, would yield an extremely large number of emails containing that term, the vast majority of which would not be germane of [sic] Ms. Hoffmann's FOIA request." ECF 35-1 ¶ 9. The same is likely true for terms like "Port" and "Capacity." Yet, in response to another FOIA request, Michael E. McFetridge, Section Chief within CBP's Office of Information Technology (OIT), explained how CBP's information technological capabilities could handle such a volume of responsive materials. *Moore v. ICE*, No. 3:19-cv-00279-DCG, ECF No. 80-1 (W.D. Tex. filed Jan. 26, 2021). Describing "Port" and "Capacity" as "generic" terms, CBP explained:

14

By generic, these specific terms are used by over 300 offices in email traffic every day. Once the upload has been completed on Thursday, January 28, 2021, the OIT Division will extract 100 sample messages out of the 90,000 email messages captured and convert the sample set to PDF format for CBP's FOIA Division to review for refinement terms. Extracting 100 messages and the conversion in PDF will take at least a day to complete as it is unknow [sic] at this time how large a data pull (as in bytes of information) will be. By Monday, February 1, 2021, OIT will provide the 100 messages converted to PDF to the FOIA Division for review for refinement terms.

McFetridge Decl. ¶ 7.

In that case, the records CBP eventually released about port capacity to a reporter demonstrated the agency was not being truthful when it turned asylum seekers away from its El Paso Port of Entry. *See* Robert Moore, "CBP turned away asylum seekers, claiming they didn't have room for them. It often wasn't true." El Paso Matters (Sept. 28, 2021) *available at* https://elpasomatters.org/2021/09/28/cbp-turned-away-asylum-seekers-claiming-they-didnt-have-room-for-them-it-often-wasnt-true/ (last visited Aug. 26, 2022). The agency subsequently agreed to pay the reporter $56,000 in legal fees. Robert Moore, "Opinion: Why I sued the federal government for records about border operations," El Paso Matters (Nov. 18, 2021) *available at* https://elpasomatters.org/2021/11/18/opinion-why-i-sued-the-federal-government-for-records-about-border-operations/ (last visited Aug. 26, 2022). Notably, these productions occurred only after the district court rejected CBP's attempts to delay the FOIA litigation with an *Open America* stay because the agency "fail[ed] to show how it ha[d] exercised due diligence in processing Plaintiff's FOIA requests." *Moore v. ICE*, 513 F. Supp. 3d 742, 748 (W.D. Tex. 2021).

Years of agency delay by CBP in response to a FOIA request about capacity to process asylum seekers turned back at the border? Déjà vu all over again. CBP's unilateral decision to narrow search terms because a search that accurately reflected what Plaintiff requested would yield too many non-responsive records is unreasonable as a matter of law. CBP's admissions in *Moore* show why. Plaintiff is entitled to summary judgment as to the unreasonability of the agency's search.

**5.  CBP's Unexplained Refusal to Search Key Offices in Response to a Request for Records Involving a Whole-of-Government Effort is Unreasonable and Inadequate as a Matter of Law.**

Plaintiff is entitled to judgment as a matter of law that CBP's refusal to search the offices of CBP's Commission, the Chief Border Patrol Agent, the Head of the Office of Field Operations, the Office of Intelligence, the Office of Congressional Affairs, and the Office of Public Affairs was unreasonable and inadequate. Mr. Howard says other sectors were unlikely to have responsive records. ECF 35-1 ¶ 6. It is simply unreasonable to believe, given the circumstances in Eagle Pass, the public record of high-level coordination across multiple executive agencies, and the public statements of CBP officials, that CBP's Agency head, its press office, its intelligence office, and its senior-most officials had *no* responsive records.

Take, for instance, then-CBP Commissioner Kevin McAleenan. According to the Human Rights First *Barred at the Border* report from April 2019, "In March 2019, CBP Commissioner Kevin McAleenan acknowledged this practice of so-called 'metering' or 'queue management' in testimony to the Senate Judiciary Committee, but claimed that only three ports of entry have long wait times for asylum seekers and that at 'most ports of entry [. . .][t]here is no waiting at all.' McAleenan also denied that restrictions on asylum processing at ports of entry push asylum seekers to cross illegally between ports." Perhaps nobody in the agency informed him of what its own "intelligence" apparatus documented on February 5, according to the records the agency produced:

> Reporting also indicates that a lot of people inside the shelter are making places and talking about crossing the border illegally. They don't want to wait for asylum processing. Conversations are about how to contact coyotes or finding a place to cross the river. They are very frustrated with not being let out of the shelter. Additional military has recently shown up at the shelter."

CBP_2021_2_00390 *available at* https://www.documentcloud.org/documents/21473082-february-5-2019-del-rio-incident-command-post-situational-report-1700hrs (last visited Aug. 26, 2022). CBP

documented at least three drownings in that river in the weeks that followed, a riot inside the military-guarded detention camp, and at least one miscarriage.

Accepting Mr. Howard and CBP's contentions in this case as true, the head of CBP did not receive or send a single communication about the mass mobilization of federal, state, local, and Mexican military and law enforcement assets in February 2019.

Plausible? No. CBP officials spent most of February claiming the agency had limited capacity to process asylum seekers at the Eagle Pass Port of Entry. Port Director Paul Del Rincon told CNN the agency could only process 16 to 20 cases per day.[5] Del Rincon explained elsewhere, "Our case processing, per person on average . . . takes about two to three hours."[6] Acting Chief Border Patrol Agent for the Del Rio Sector Matthew J. Hudak Customs and Border Protection Deputy Commissioner Robert Perez told CNN: "The fact is that Eagle Pass is not a very big place . . . There's limited capacity there."[7] *See also* ECF 36 at 3 n.4-7. This Court need not accept CBP's contention that nobody higher up than the Del Rio Sector or Laredo Field Office ever received or created a communication about an event Fox News described on February 13, 2019, this way: "Border agents overwhelmed as Texas begins processing migrant caravan." ECF 36 at 13 n.17. Plaintiff is entitled to judgment as a matter of law that CBP's search was inadequate because no reasonable jury could

---

[5] Martin Savidge and Steve Almasy, "Texas law enforcement offices line the banks of the Rio Grande to wait for migrant caravan" CNN (Feb. 8, 2019) available at https://www.cnn.com/2019/02/08/politics/texas-border-response-migrant-caravan/index.html (last visited Aug. 26, 2022).

[6] Joey Palacios & Normal Martinez, Border Security At Eagle Pass Crossing Tightens As Army, Police Watch Migrants Gathered Across River," Texas Public Radio (Feb. 7, 2019) available at https://www.houstonpublicmedia.org/articles/news/texas/2019/02/07/321039/border-security-at-eagle-pass-crossing-tightens-as-army-police-watch-migrants-gathered-across-river/.

[7] Geneva Sands, "What the Trump administration says is happening at the border," CNN (Feb. 15, 2019) *available at* https://www.cnn.com/2019/02/15/politics/trump-admin-border (last visited Aug. 26, 2022).

conclude that only the Del Rio Sector and Laredo Field Office possessed communications about the February 2019 migrant caravan.

> **6. Plaintiff is Entitled to Summary Judgment That CBP's Search Was Inadequate Because the Agency Improperly Withheld Responsive Records, Even After Plaintiff Demonstrated They Exist.**

Plaintiff is entitled to judgment as a matter of law that CBP unlawfully withheld responsive records she identified as extant based on the documents CBP released, but which were not subsequently turned over or claimed as exempt by the agency. "[D]iscovery of a document that clearly indicates the existence of other relevant documents creates an obligation for an agency to conduct a further search for those additional documents." *New Orleans Workers Ctr.*, 373 F. Supp. 3d at 48 (quoting *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 215 F. Sup. 2d 94, 110 (D.D.C. 2002) (cleaned up). Agencies must pursue "clear and certain leads" regarding potentially responsive records. *Id.* (quoting *Kowalczyk v. Dept' of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996)).

On March 18, 2022, Plaintiff identified multiple records that clearly exist but that CBP failed to disclose. ECF 36-2 - Pl.'s Mar. 18, 2022, Production Deficiency Report. She did so based on the records CBP disclosed, showing that each daily email from CBP Watch Intel had the exact same format, and, critically, an "Update" number. *Id* at 3. The February 1, 2019, email has the subject line: "Central American Caravans and Migrant Crisis Flow - Update 27." The next record in CBP's production is from February 4, 2019. Its subject line is, "Central American Caravans and Migrant Crisis Flow - Update 30." Updates 28 and 29–corresponding to February 2 and 3, respectively, are missing. Similarly, CBP disclosed the reports for February 5-8, which had the same subject line, except that they were "Updates" 31-34. The next, similar record CBP disclosed was Update 38, which was sent on February 12. Updates 35-37, corresponding to February 9-11, are extant and missing.

The agency filled the other gaps Plaintiff identified in the MCAT Reports and Queue Management Reports with supplemental productions provided on July 13, 2022–just two days before the original due date of its Motion for Summary Judgment. But it has not filled these. Nor does Mr. Howard offer any explanation for their absence. ECF 35-6.

There is thus no genuine issue of material fact that CBP unlawfully withheld these records. Plaintiff is entitled to judgment as a matter of law, and an injunction requiring their immediate release with appropriate withholdings.

**B. PLAINTIFF IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT EAGLE PASS PORT OF ENTRY CAPACITY NUMBERS ARE NOT EXEMPT UNDER 7E**.

CBP officials' repeated public statements to the media that the Eagle Pass Port of Entry only has capacity to process 12-20 asylum seekers each day entitle Plaintiff to judgment as a matter of law that it improperly withheld Eagle Pass POE capacity. To qualify for protection from public disclosure under the law enforcement techniques and procedures exemption, 5 U.S.C. ¶ 552(b)(7)(E), the agency must first show this information is not public. But as set forth in detail in Plaintiff's Response opposing CBP's motion for summary judgment, the Port Director and the Chief Border Patrol Agent have already disclosed this information. ECF 36 at 13. Repeatedly. *Id.* To CNN. *Id.* n.13. And NPR. *Id.* n.15. And in front of a gaggle of reporters next to the Eagle Pass POE. *Id.* at 14. The fact that such numbers have been released by CBP elsewhere, and published in a DHS-OIG report that found CBP was not being accurate about its capacity, removes any doubt as to whether CBP's hypothesized threats from releasing this information are based on facts.

## IV.    CONCLUSION

For the reasons outlined above, Plaintiff is entitled to partial summary judgment that CBP improperly withheld reasonably segregable, non-exempt records responsive to her request by failing to conduct an adequate search and by withholding non-exempt material. She respectfully requests that this Court GRANT her motion for summary judgment and schedule an evidentiary hearing to consider the appropriate forms of injunctive relief or sanctions, including a referral to the Special Counsel for withholdings the Court deems arbitrary and capricious, pursuant to 5 U.S.C. ¶ 552(f)(i).

Respectfully,

_____

ADAM SNYDER
THE **ALLGOOD** FOUNDATION
*Counsel for Plaintiff*
The Goodman Theater Building
60 W. Randolph St., Suite 400
Chicago, Illinois 60601
asnyder@kjs-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused a true and correct copy of the foregoing Motion for Summary Judgment, which has been electronically filed and is available for viewing and downloading from the Court's ECF system, to be served upon defendant via First Class Mail to the following address:

> Jennifer Arbittier Williams
> United States Attorney
> Eric D. Gill
> Assistant United States Attorney
> U.S Department of Justice
> Eastern District of Pennsylvania
> 615 Chestnut Street
> Suite 1250
> Philadelphia, Pennsylvania 19106-4476
> Eric.Gill@usdoj.gov

Submitted this 27th day of August, 2022.

Respectfully,

_____

ADAM SNYDER
THE **ALLGOOD** FOUNDATION
*Counsel for Plaintiff*
The Goodman Theater Building
60 W. Randolph St., Suite 400
Chicago, Illinois 60601
asnyder@kjs-law.com