# Exhibit 2



P.O. Box 15894, Philadelphia, PA 19103
Tel: (412) 916-4509    Fax: (607) 428-7661
karen@syrenalaw.com

**VIA EMAIL**

Hon. Anita B. Brody
U.S. District Court Judge
Eastern District of Pennsylvania
James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

Jennifer Arbittier Williams
United States Attorney
Eric D. Gill
Assistant United States Attorney
U.S Department of Justice
Eastern District of Pennsylvania
615 Chestnut Street
Suite 1250
Philadelphia, Pennsylvania 19106-4476
Eric.Gill@usdoj.gov

      Re:    *Hoffmann v. U.S. Customs and Border Protection*, 20-CV-06427

Dear Judge Brody and Attorney Gill:

      This letter responds to Attorney Gill's November 26, 2021, communication on behalf of Defendant U.S. Customs and Border Protection (CBP) (the "DOJ Letter") pursuant to Your Honor's order. Dkt. No. 20. The purpose of this letter is to offer Plaintiff's position in advance of the upcoming status conference, currently set for December 14, 2021.

      **A. Plaintiff's FOIA Request**

      This case concerns a Freedom of Information Act (FOIA) request for records concerning the operation in Piedras Negras, Mexico and Eagle Pass, Texas of a CBP program with which the agency is deeply familiar. Beginning in 2018, pursuant to the agency's then-secret "Metering" program, CBP officers lied about the physical capacity of the government to process asylum seekers who presented themselves for inspection at Ports of Entry (POE) along the U.S.-Mexico

border, turning away thousands of vulnerable humans seeking protection, and forcing them into the hands of state- and non-state actors CBP deputized to manage its queues.[1]

As DHS's Inspector General informed the agency in 2020[2], and as a federal court held in September, CBP's Metering program is unlawful.[3] As a result, the current Administration terminated the program in November.[4]

Both before and after suspension, Metering garnered widespread and exceptional media interest.[5] Records already secured from the agency despite its documented FOIA violations

---

[1] *See* Robert Moore, "CBP turned away asylum seekers, claiming they didn't have room for them. It often wasn't true," El Paso Matters (Sept. 28, 2021) available at https://elpasomatters.org/2021/09/28/cbp-turned-away-asylum-seekers-claiming-they-didnt-have-room-for-them-it-often-wasnt-true/. *See also* Stephanie Leutert and Caitlyn Yates, Metering Update, University of Texas at Austin, Strauss Center for International Security and Law (Nov. 2021) available at https://www.strausscenter.org/wp-content/uploads/Nov_2021_Metering.pdf.

[2] Dep't of Homeland Security Office of Inspector General, "CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry," No. OIG-21-02 (Oct. 27, 2020) available at https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-02-Oct20.pdf;

[3] *See* Center for Constitutional Rights, "Court Says Turnbacks of Tens of Thousands of Asylum Seekers Are Unlawful," (Sept. 2, 2021) available at https://ccrjustice.org/home/press-center/press-releases/court-says-turnbacks-tens-thousands-asylum-seekers-are-unlawful. The Court's Order declaring CBP's metering activities unlawful is available here: https://ccrjustice.org/sites/default/files/attach/2021/09/742%20Order%20granting%20in%20part%20Plaintiffs%20Motion%20for%20Summary%20Judgment%202021.08.02.pdf. *See also* Hillel R. Smith, "The Department of Homeland Security's "Metering" Policy: Legal Issues," Congressional Research Service (Oct. 15, 2021) available at https://sgp.fas.org/crs/homesec/LSB10295.pdf.

[4] *See* Guidance for Management and Processing of Undocumented Noncitizens at the Southwest Border Land Ports of Entry, U.S. Customs and Border Protection (Nov. 1, 2021) available at https://www.cbp.gov/sites/default/files/assets/documents/2021-NovCBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf

[5] Coverage of metering won This American Life its first-ever Pulitzer Prize — the first ever awarded for audio journalism. *See* https://www.thisamericanlife.org/688/the-out-crowd and https://www.pulitzer.org/winners/staff-american-life-molly-otoole-los-angeles-times-and-emily-green-freelancer-vice-news. *See also* James Frederick, "Metering at the Border" National Public Radio (Jun. 29, 2019) available at https://www.npr.org/2019/06/29/737268856/metering-at-the-border. Julian Resendiz, "Advocates: U.S. still turning back asylum-seekers at southern border," Border Report (Nov. 9, 2021) available at https://www.borderreport.com/hot-topics/immigration/advocates-u-s-still-turning-back-asylum-seekers-at-southern-border/. Adam Isaacson, "'I Can't Believe What's Happening—What We're Becoming': A Memo from El Paso and Ciudad Juarez," Washington Office of Latin America (Dec. 19, 2019) available at https://www.borderreport.com/hot-topics/immigration/advocates-u-s-still-turning-back-asylum-seekers-at-southern-border/. Lorelei Laird, "Strangers in a strange land: 'Metering' makes asylum rights meaningless, advocates say," ABA Journal (Jul 24, 2019) available at https://www.abajournal.com/web/article/strangers-in-a-strange-land-human-rights-organizations-say-metering-of-asylum-seekers-makes-asylum-rights-meaningless.C. Nicholas Cuneo, M.D., M.Ph. & Hannah Janeway, M.D., "From Icebox to Tinderbox — A View from the Southern Border" 81 New England. J. Med 383 (Sept. 24, 2020) available at https://www.nejm.org/doi/full/10.1056/NEJMp2009985. Gus Bova, "In Matamoros, Asylum-Seekers Wait, and Wait and Wait," Texas Observer (Jul. 2, 2019) available at https://www.texasobserver.org/in-matamoros-asylum-seekers-wait-and-wait-and-wait/. Sarah Stillman, "The Race to Dismantle Trump's Immigration Policies," The New Yorker (Feb. 1, 2021) available at https://www.newyorker.com/magazine/2021/02/08/the-race-to-dismantle-trumps-immigration-policies.Ryan Devereaux, "An Asylum Mirage," The Intercept (Apr. 9, 2021) available at https://theintercept.com/2021/04/18/biden-border-patrol-asylum-title-42/. Daniel Wiessner, "Judge says 'metering' of asylum applicants at border are illegal," Reuters (Sept. 3, 2021) available at https://www.reuters.com/legal/litigation/judge-says-metering-asylum-applicants-border-is-illegal-2021-09-03/. Camilo Montoya-Galvez, "U.S. rescinds Trump-era rules that limited processing of asylum-seekers at border

demonstrate that it withheld evidence from the Inspector General and the public about this program.[6]

In Piedras Negras, the Metering list was maintained by Hector Menchaca, a designee of the municipal government.[7] In the months corresponding to Plaintiff's FOIA request, human rights observers documented allegations by asylum-seekers in Piedras Negras that paying $1,000 would shorten the wait-time from months to weeks.[8] Vulnerable asylum-seekers faced an impossible choice: Cross between ports of entry without inspection, in violation of 8 USC §1325 or § 1326, or remain in Piedras Negras, where human rights observers documented beatings of asylum seekers and deportations to the countries they fled.[9]

When Plaintiff made her request in February 2019, CBP was actively covering up the existence of its unlawful Metering program from the Office of Inspector General. CBP was actively fighting a preliminary injunction challenging its Metering Policy while Plaintiff's FOIA request was pending.[10] By the time she filed her lawsuit, discovery was active in the litigation that would ultimately result in the program being declared unlawful and terminated.

It is within this context that the court should assess both the adequacy of CBP's search and the declarations the agency has proffered to support it.

Plaintiff requested the following records from CBP on February 21, 2019:

*[1] Any and all correspondence and/or record of communications between CBP agents or employees and Hector Menchaca.*

*[2] Any and all correspondence and/or record of communications between CBP agents or employees and the telephone number +52-878-703-4297.*

*[3] Any and all communications relating to the capacity of CBP to accept asylum seekers for processing at the Eagle Pass POE from January 1, 2019 to present.*

*[4] Any and all internal or external CBP communications regarding a list of migrants*

---

crossings," CBS News (Nov. 3, 2021) available at https://www.cbsnews.com/news/immigration-us-processing-asylum-seekers-border-crossings-metering/.

[6] *Supra* note 1.

[7] "Asylum and Metering Turnbacks," American Immigration Council (Mar. 2021) ("Along the Rio Grande Valley, lists were maintained by a wide variety of actors, including private shelters in Nuevo Laredo, *the municipal government in Piedras Negras*, and asylum seekers living in an encampment in Matamoros.") (emphasis added) available at https://www.americanimmigrationcouncil.org/sites/default/files/research/metering_and_asylum_turnbacks_0.pdf.

[8] "Metering Update," Strauss Ctr for Int'l Security & Law & Center for U.S.-Mexican Studies at 9 (Nov. 2019) available at https://usmex.ucsd.edu/_files/metering-update_nov-2019.pdf. *See also* "Barred at the Border; Wait "Lists" Leave Asylum Seekers in Peril at Texas Ports of Entry, "Human Rights First" (Apr. 2019) ("In Piedras Negras, where private individuals have run the list on behalf of the municipality, previous "list" manager allegedly extracted payments from asylum seekers to join a parallel, expedited "list.") available at *https://www.humanrightsfirst.org/sites/default/files/BARRED_AT_THE_BORDER.pdf.*

[9] *Supra* note 8, Barred at the Border at 2.

[10] *See Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020).

*awaiting their turn to present themselves at the Eagle Pass POE from January 1, 2019 to present.*

*[5] Any and all internal or external CBP communications regarding migrants detained in Piedras Negras, Mexico from January 1, 2019 to present.*

## B.  CBP's Search Was Inadequate

CBP has failed to establish it conducted an adequate search. As set forth below, the agency's declarations provide insufficient detail to allow the Court to conclude the agency tasked a search reasonably calculated to uncover all responsive records. The declarations CBP provides fail to satisfy the agency's burden of showing it conducted an adequate search. The agency should therefore voluntarily retask its search with appropriate scope and terms, grant Plaintiff's request for expedited processing, and begin productions of any additional responsive records as soon as practicable.

 "Under the FOIA, an agency has a duty to conduct a reasonable search for responsive records." *Abdelfattah v. U.S. Dep't of Homeland Security*, 488 F.3d 178, 182 (3d Cir. 2007) (per curiam). "To demonstrate the adequacy of its search, the agency should provide a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched." *Id.* (internal quotations omitted). The agency bears the burden of showing "beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents." *Wadhwa v. Dep't of Veteran Affairs*, No. 11-171 at *6 (3d Cir 2011) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F. 2d 1344, 1351 (D.C. Cir. 1983)). *Accord Abdelfattah*, 488 F.3d at 182 (citing *Valencia-Lucena v. U.S. Coast Guard*, 180 F. 3d 321 (D.C. Cir. 1999) as the standard for evaluating the sufficiency of agency affidavits in establishing search adequacy). Because "the fundamental principle animating FOIA is public access to government documents" agencies responding to FOIA requests must "make more than perfunctory searches and, indeed, follow through on obvious leads to discover requested documents." *Valencia-Lucena*, 180 F.3d at 325. The agency "cannot limit its search" to one or more places if there are additional sources that are likely to turn up the information requested." *Id.* (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

### 1.  The Howard Declaration

CBP relies exclusively on the November 16, 2021, Howard Declaration to justify the adequacy of its initial searches. DOJ Ltr at 2. Even accepting the representations in the Howard Declaration at face value, the agency's search fails on several independent grounds.

#### a.  Scope Issues with the Initial Del Rio Sector USBP Search

CBP's search was inadequate in part because its limited initial Del Rio search was not reasonably calculated to uncover all responsive agency records. The scope of this search was indefensibly narrow for at least seven reasons. *First,* CBP improperly limited the scope of its initial search to include exclusively the US Border Patrol (USBP)—which does *not* run the Eagle

Pass Port of Entry—instead of CBP's Office of Field Operations (OFO)—which *does*. Howard Decl. Para. 4.  *Second*, CBP then unreasonably limited its search even further by inexplicably deciding to encompass only the USBP Del Rio Sector. Howard Decl. Para 5. This decision meant the agency improperly excluded from its search tasking any Border Patrol agents who were in Eagle Pass during the January-February 2019 period listed in Plaintiff's request, but who were not there at the time CBP determined whether responsive records existed. *Third*, CBP fails to offer any justification for why the "triage" process resulted in selection of only these narrow locations within the agency, to the exclusion of all others. Howard Decl. Paras. 3-5.

*Fourth*, CBP provides insufficient information to assess the basis upon which it went about "identifying internally which officers or personnel were most likely to have responsive records[.]" Howard Decl. Para. 5. *Fifth*, CBP fails to specify which "shared drives" the Del Rio Sector Intelligence Unit searched, why that Unit was the appropriate component within CBP to conduct the searches, rather than the FOIA Division itself, or any of the other IT offices who provided declarations as to supplemental searches.  Howard Decl. Para 5. *Sixth,* there is no information in CBP's declarations about the initial search that would explain why "shared drives" of the US Border Patrol in the Del Rio Sector were appropriate locations to search for "communications between CBP agents/employees and the telephone number +52 878-703-2497." Wouldn't phones also be appropriate locations to search for communications with a phone number?

*Seventh*, there is no information to substantiate the Del Rio Sector's determination that no paper records responsive to the request exist. Howard Decl. Para. 6.

### b.  Terms Issues With the Initial USBP Del Rio Sector Search

In addition to these scope issues, the terms CBP used in the Initial Del Rio search were inadequate. Perhaps because they are not FOIA professionals and have not been established in the Howard Declaration to possess any relevant expertise or training in responding to FOIA requests, the Del Rio Sector Intelligence Unit improperly used search terms narrower than those in Plaintiff's request. Howard Decl. Para 5. Plaintiff submitted a request for five categories of records. One category sought records of communications concerning a "list of migrants waiting to present themselves at Eagle Pass." Another category sought communications concerning migrants detained from January 1, 2019 to February 21, 2019. The Initial USBP Del Rio Sector Search did not include any reference to a list of migrants waiting to present themselves. Failing to include search terms calculated to uncover all records responsive to Plaintiff's request was manifestly inadequate.

### c.  Scope Issues with the Initial OIT EDMED Search

The second part of CBP's initial search was also inadequate. CBP does not explain why it tasked the Office of Information Technology (OIT) Enterprise Data Management and Engineering Directorate (EDMED) to search for emails, but *not* for telephone and other electronic messages. Howard Decl. Para 7. CBP claims OIT "is included" in the FOIA Division's triage process when a request seeks email communications. Howard Decl. Para 3. But the agency does not explain why a similar protocol is not in place for searching phone and other

text records. This omission is especially problematic, given CBP's inability to remotely access or search text or WhatsApp messages.

### d. Terms Issues with the Initial OIT EDMED Search

CBP also fails to explain why it cherry-picked only two of the five categories in Plaintiff's request to formulate search terms in conducting its email search. Howard Decl. Para 7. CBP does not explain why the Del Rio Intelligence Unit's search of the USBP shared drives included six terms, but OIT EDMED included only four. The Howard Declaration also fails to identify what system(s) of records OIT EDMED searched, and when. Without this information, the court cannot assess whether the agency's search was reasonably calculated to lead to all responsive records, and thus, the agency cannot carry its burden of demonstrating it conducted an adequate search.

### e. Further Unanswered Questions Based on the Howard Declaration

The Howard Declaration reveals the facial inadequacy of CBP's initial search in several additional respects.

First, in response to a FOIA request that included records of communications with a telephone number, it appears CBP initially searched *no* phones and *no* phone records. Howard doesn't even specify what offices at CBP would hold such records and in what form they might be stored. Refusing without explanation to conduct a search of phone records in response to a FOIA request for communications with a specific phone number cannot possibly constitute a search reasonably calculated to uncover all responsive records. Indeed, it seems calculated to do just the opposite by eliminating the most likely category of responsive records from the initial search.

Second, in response to Plaintiff's request for records of CBP communications about a POE— which is operated by CBP's OFO —the FOIA Division tasked the Border Patrol, which does not operate Ports of Entry. *See Al Otro Lado v. Mayorkas*, No. 3:17-cv-02366-BAS-KSC, Dkt 742 at 2 (S.D. Cal. Sept. 2, 2021) ("The Office of Field Operations ("OFO") a division of CBP, is responsible for the management of operations at POEs in the United States. (JSUF 4)."). Like CBP's refusal to search its phone records, this basic failure to identify the likely offices within CBP that might possess responsive records and actually task those locations renders the Initial Searches facially inadequate and requires retasking.

Third, CBP ignored more obvious leads that its own FOIA Office has recently been forced to disclose in other contexts. For example, the agency neglected to reference any of its own queue management records referenced in the DHS Inspector General report pertaining to the agency's unlawful metering policy. Records like the CBP Daily Queue Management Report referenced on page 17 of the Inspector General's report would no doubt be responsive to part of Plaintiff's request. In fact, it was these records from the Inspector General that recently resolved another FOIA lawsuit requiring the agency to pay $52,000 in attorney's fees following a finding by the U.S. District Court for the Western District of Texas that the CBP failed to conduct an

adequate search for records *including those relating to capacity at CBP Ports of Entry* during the agency's unlawful metering program.

Fourth, CBP has not established it used the correct search period, thus raising the possibility that the agency unreasonably narrowed the search window to be smaller than Plaintiff's request. While three of the requests include a search period of January 1, 2019 to February 21, 2019, three do not. In the absence of a specified search period, the agency may generally apply a cut-off date that matches the date it tasked its initial search.[11] But in this case, because the Howard Declaration does not specify the date on which CBP tasked the search, it has not established that it applied an appropriate cut-off date.

At least in the case of the OIT EDMED search, it appears the agency failed to do so. That is because it limited the temporal scope of the search to January 1, 2019 through February 25, 2019. Howard Decl. Para. 7. By contrast, the Del Rio the Sector Intelligence Unit searched from January 1, 2019 through an unspecified date. Plaintiff did not temporally limit the first three categories in her request, so the cut-off date applied should be the date CBP began its search. From the Howard Declaration it is impossible to tell when that was. Consequently, the court cannot assess the reasonability of temporal scope in CBP's search.

Fifth, the Court now has five declarations and a letter from the Department of Justice before it, but none of them explain how it went about determining who Hector Menchaca was and which offices, custodians, and system of records may have possessed communications between him and CBP. Without such explanation, the search for that sub-part of Plaintiff's request is facially inadequate.

Plaintiff therefore requests that the court order CBP to task supplemental searches with appropriate location, scope, and terms. She requests expedited processing of this request pursuant to 6 C.F.R. 5.5(e).

## 2.  The Port Directors' Inexplicably Missing Phone and Phone Data

The declarations CBP submitted raise "possible questions about the government's integrity which affect public confidence." Phone data that should have been preserved upon receipt of Plaintiff's FOIA — or disposed of in accordance with the Federal Records Act — appears to have been destroyed. A government-issued telephone is inexplicably missing. The head of CBP's FOIA Division, Patrick Howard, claims under oath that the most likely location for CBP POE records is the Border Patrol, notwithstanding his participation as a Declarant in the *Moore* litigation in the Western District of Texas.

This missing phone and deleted data occurred in the context of overlapping preservation obligations imposed by Plaintiff's request, many other FOIA requestors' requests, and the discovery process in *AOL v. Mayorkas*, to say nothing of the Federal Records Act.[12] In other FOIA cases involving destruction of potentially responsive agency records, courts have granted limited discovery to inquire regarding the agency's retention and destruction policies. *See, e.g.,*

---

[11] *See generally* https://www.justice.gov/oip/blog/foia-post-2004-use-cut-dates-foia-searches.

[12] *See* Item 20 https://www.archives.gov/files/records-mgmt/grs/grs04-2.pdf.

*Raher v. BOP*, No 09-526, 2012 WL 2721613 (D. Or. Jul. 6, 2012). Without more information about the steps the agency took to attempt to track down purportedly deleted data and the missing government-issued phone, the court cannot conclude the agency reasonably calculated the methods of its search to locate responsive records. And without information regarding the retention, destruction, and litigation hold obligations that may have applied to each Port Director's phones and data regarding its illegal Metering program, the agency is not entitled to the presumption of good faith.

### C.  CBP Is Violating FOIA's Promptly Available Requirement

CBP's failure to conduct an adequate search constitutes an ongoing, unlawful withholding because the agency has failed to make records promptly available as required by law.

Upon receiving a properly addressed and formatted request to the correct agency component, agencies "**shall** make the records **promptly available** to the person." 5 U.S.C. § 552(a)(3)(A) (the Promptly Available Requirement) (emphasis added). While the Act does not specify what period of time qualifies as "prompt," the surrounding text, legislative history and statutory purpose all demonstrate that a nearly three-year wait for records is in no way "prompt" under FOIA.

The phenomenon of agency delay in response to FOIA requests is not novel. Congress has acted time and again to ensure agencies fulfill the broken promise of FOIA's time limits and to incentivize them to respond more quickly. *See* 104 Cong. Rec. 47, 50 (daily ed. Sept. 17, 1996) (statement of Rep. Tate) ("Unfortunately—time after time—FOIA's promise to make Government information open and accessible has been broken. On many occasions—simple requests for information have languished—unanswered—for years. . . . This legislation also addresses the problems many citizens face when requesting Federal records—unacceptable delays in getting an answer[.]") Because "long delays in access can mean no access at all," the 1996 FOIA Amendments endeavored to "increase public access to the electronic records of Federal agencies, and take long overdue steps to alleviate the delays in processing requests for Government records." 108 Cong. Rec. 76, 88 (daily ed. July 28, 1995) (statement of Sen. Leahy) (emphasis added).

Delays in processing and responding to FOIA requests, which Congress noted with concern could take over two years in some cases, were described as "intolerable" and "not the level of customer service the American people deserve from their public servants," forming the catalyst behind the amendments. *See* 108 Cong. Rec. 76, 88 (daily ed. July 28, 1995) (statement of Sen. Leahy) (emphasis added). *See also* 104 Cong. Rec. 47, 51 (daily ed. Sept. 17, 1996) (statement of Rep. Maloney); S. Rep. No. 104-272, at 10 (1996) ("The bill is also intended to promote agency compliance with statutory time limits. Chronic delays in receiving responses to FOIA requests are the largest single complaint of persons using the FOIA to obtain Federal agency records and information."). The 1996 amendments therefore extended the statutory time limit for an agency's initial determination from ten to 20 days, encouraged the implementation of a two-track processing system for simple and complex requests, and provided for expedited

processing for certain requests. 108 Cong. Rec. 76, 88 (daily ed. July 28, 1995) (statement of Sen. Leahy).

Despite the 1996 amendments, delays in agency responses persisted. Congress again attempted to remedy agencies' recalcitrant untimeliness in 2007 by introducing legislation aimed at addressing the "growing backlog of FOIA requests" in order to "restore[] meaningful deadlines for agency action." S. Rep. No. 110-59, at 3 (2007). With the 2007 amendments, Congress abrogated the Supreme Court's decision in *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598 (2001), which created perverse incentives for agencies to delay compliance. See S. Rep. No. 110-59, at 4 (2007). *Buckhannon* abolished the catalyst theory, which, as applied to the FOIA, allowed agencies to simply turn over records when sued, left requesters to bear the cost of agency timing violations, and allowed agencies to violate time limits without paying the price. *See* S. Rep. No. 110-59, at 4 (2007) ("When applied to FOIA cases, *Buckhannon* precludes FOIA requesters from ever being eligible to recover attorney's fees under circumstances where an agency provides the records requested in the litigation just prior to a court decision that would have been favorable to the FOIA requestor. The bill clarifies that *Buckhannon* does not apply to FOIA cases").

By clarifying the award of attorney's fees to successful requesters, Congress sought to encourage FOIA litigation in order to hold agencies accountable. *See* S. Rep. No. 110-59, at 4, footnote 3 (2007) ("Under *Buckhannon*, it is now theoretically possible for an obstinate government agency to substantially deter many legitimate and meritorious FOIA requests . . . As a result, many attorneys could stop taking on FOIA clients – and many FOIA requestors could stop making even legitimate and public-minded FOIA requests[.]") (emphasis in original). But that was not enough. Agencies persisted in failing to adequately fund their FOIA offices with sufficient resources to meaningfully anticipate demand and reduce backlogs.[13]

In 2015, Congress again expressed concern over the growing backlog in FOIA requests and the stubborn persistence of agencies in violating the FOIA's time limits. *See* S. Rep. No. 114-4, at 2 (2015) ("As the number of requests grows, so does the backlog of agency responses. A response to a FOIA request is considered to be backlogged if it has been pending with a Federal agency longer than the statutorily prescribed deadline to respond. At the end of Fiscal Year 2013, more than 95,000 responses to FOIA requests were backlogged with a Federal agency—a 33% increase from Fiscal Year 2012.") (footnotes omitted). The 2015 amendment imposed further costs to the agency to coerce compliance: search fees could not be assessed if the agency does not comply with the time limits.  See 5. U.S.C. § 552(a)(4)(A)(viii)(I).

Each time Congress has amended the FOIA, its focus has remained on the necessity of meeting the Act's time limits and making records promptly available to requestors. This continuing Congressional concern with agency timeliness explains the statute's plain language requiring records to be made "promptly available." Congress was aware of the pervasive noncompliance by agencies with the FOIA's time limits, yet it has not changed or extended those time periods since 1996. Indeed, rather than lower the bar for agencies, Congress has heightened

---

[13] "The Increase in FOIA Lawsuits Isn't the Problem — It's Agencies Underfunding Their Transparency Obligations," American Oversight (Mar. 17, 2020) available at https://www.americanoversight.org/the-increase-in-foia-lawsuits-isnt-the-problem-its-agencies-underfunding-their-transparency-obligations.

the penalties for noncompliance. As such, Congress' time limits must be strictly followed and rigorously enforced, including the "Promptly Available" Requirement.

CBP's serial failures to adequately task searches responsive to Plaintiff's request—including in the year that will soon have elapsed since Plaintiff filed her request—violate the Promptly Available requirement. The court should therefore consider CBP's present violation of the Act when reviewing future statements by CBP regarding the compliance to ensure that the agency's desire to end this litigation does not lead it to cut corners or omit obvious leads in responding to Plaintiff's request.

### D.  Plaintiff's Proposal

Since Plaintiff's first communications with the Department of Justice in this case, she has been assured that CBP conducted an adequate search for records responsive to her request, and that no additional records are available. CBP boldly asserts "no additional action by CBP is necessary because no additional responsive, non-privileged information remains to be produced." DOJ Ltr. At 4. But the manifest deficiencies in the process CBP employed, as laid out in the Howard Declaration, preclude such a result.

Plaintiff proposes the following steps for CBP to take immediately. Should the agency refuse, Plaintiff humbly requests that the Court order it to take those steps:

1. CBP should adjudicate Plaintiffs' Expedited Processing within ten working days of receiving this letter and notify Plaintiff of its decision on it within that period.

2. CBP should present Plaintiff with a proposal for how it intends to remedy the search inadequacies identified above, with estimated timeframes for having records in hand, by no later than **January 14, 2022**.

3. CBP should begin rolling productions of responsive records returned from supplemental searches no later than **March 4, 2022**.

4. Plaintiff is in the process of retaining an expert witness to review the steps CBP took to recover phone and digital records. CBP should make available a representative who is competent to discuss the agency's relevant systems of records and information technology to meet and confer with Plaintiff's expert by **January 14, 2022,** regarding the agency's capacity and additional steps the agency may or may not be able to take to recover missing or deleted data.

5. If both parties agree that their conferrals are steering this case toward a speedy and efficient resolution, this Court should set a status hearing for **March 11, 2022.** If either party believes it requires assistance of the Court on any disagreement that may arise in conferral regarding the four issues above, both parties shall submit a joint statement setting forth their respective positions and availability for a status hearing with the court.

Plaintiff looks forward to discussing these matters further at the upcoming status conference.

Dated: December 10, 2021

Respectfully submitted,

/s/Karen L. Hoffmann
Karen L. Hoffmann, Esq.
Syrena Law
P.O. Box 15894
Philadelphia, PA 19103
(412) 916-4509
karen@syrenalaw.com

*Plaintiff* Pro Se