UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAREN HOFFMANN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:20-cv-06427-AB |
| ) | |
| U.S. CUSTOMS AND BORDER ) | |
| PROTECTION, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO U.S. CUSTOMS AND BORDER PROTECTION'S MOTION FOR SUMMARY JUDGMENT**

Freedom of Information Act (FOIA or the "Act") requester and Plaintiff Karen Hoffmann, through undersigned counsel, respectfully submits this Response in Opposition to Defendant U.S. Customs and Border Protection (CBP)'s Motion for Summary Judgment. ECF No. 70.

**I. INTRODUCTION**

This FOIA case seeks agency records of officially acknowledged government lawbreaking. The CBP conduct at the heart of Ms. Hoffmann's FOIA request resulted in judicial findings that the agency's policies are unlawful, and warnings from the agency's independent watchdog, the Department of Homeland Security (DHS) Office of Inspector General (OIG). CBP's unlawful actions also contributed to multiple, preventable deaths of migrants seeking asylum—including children—and to the unlawful detention and acute suffering of some 1,800 fellow human beings engaged in the legally protected act of attempting to seek asylum at a U.S. Port of Entry (POE).

These officially acknowledged facts of CBP's unlawful conduct are the touchstone for nearly every legal issue in dispute. CBP broke the law in how it responded to asylum-seekers at the U.S.-Mexico border in February 2019. It broke the law again–and indeed, continues to break the law–in its

1

response to Ms. Hoffmann's request for records about its initial lawbreaking. Because the agency has, throughout this litigation, refused to comply with its legal obligations, unless forced to do so by court order, and has also destroyed critical evidence during this litigation, CBP's motion for summary judgment should be denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On February 21, 2019, Ms. Hoffmann submitted a five-part request for agency records to CBP's FOIA Office. ECF No. 1, Compl. ¶ 12. Her request sought information aimed at shedding light on CBP's coordinated efforts to repel an estimated 2,000 mostly Central American asylum seekers from the areas in and around the Eagle Pass POE, which is located in the Del Rio, Texas Border Patrol Sector. While both nations amassed hundreds of troops and law enforcement officials on their respective sides of the Rio Grande, CBP pressured Mexican authorities to forcibly imprison asylum-seekers under armed guard and barbed wire in a pop-up detention center that previously served as a body bag factory in Piedras Negras, Coahuila, Mexico.

As national and international media documented in real-time, CBP's public justifications for these efforts to turn back asylum-seekers, suppress humanitarian aid and legal assistance available on both sides of the border, and permanently install new programs that unlawfully cut off asylum access at POEs all relied on public claims that the agency lacked capacity to process these claims. CBP applied these policies, alternatively labeled "queue management" or "metering" by the government and "asylum turnbacks" by legal advocates, as part of what the then-U.S. president described as a "Human Wall". Amidst a looming government shutdown and State of the Union address, the optics of a 2,000-person caravan of Central American asylum-seekers heading toward Eagle Pass, Texas served a critical role in the prior administration's pressure campaign to get Congress (not Mexico) to fund the President's border wall and further militarize the U.S.-Mexico border. As the president and a Senate hopeful from the opposition party held competing rallies in El Paso, Texas on February 11, 2019, a

2

deadly humanitarian crisis borne of CBP's policies rapidly escalated hundreds of miles away in Eagle Pass. Thousands of U.S. and Mexican military, police, and immigration confining them instead in a makeshift detention camp on the Mexican side of the Rio Grande under the armed guard of officials from Piedras Negras, Coahuila, Mexico.

To complete their journey and invoke their right to seek asylum at the Eagle Pass POE, the migrants had to go through one man: a private citizen selected by Mexican state authorities named Hector Menchaca. Contemporaneous observations in Piedras Negras by human rights observers documented how Mr. Menchaca used WhatsApp to communicate with CBP officers about the "list" of asylum-seekers waiting to present their claims at the POE.

When Ms. Hoffmann filed her request on February 21, 2019, the statements in the foregoing paragraph were merely allegations. In the five years CBP has taken to respond to her request, these allegations matured into judicial findings that CBP – the Defendant in this action – broke the law by cutting off asylum seekers' access to Ports of Entry (POEs) in reliance on capacity limitations the government itself manufactured. See *Al Otro Lado, Inc. v. Mayorkas*, No. 17-CV-02366-BAS-KSC, 2021 WL 3931890, at *23 (S.D. Cal. Sept. 2, 2021) (holding CBP's "metering" policy, which turned back asylum-seekers and forced them into long, chaotic queues in Mexico based on manufactured capacity shortages in U.S. ports of entry, violates the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment to the U.S. Constitution). CBP's government watchdog, the Department of Homeland Security (DHS) Office of Inspector General (OIG) separately concluded DHS urged asylum-seekers to POEs while reassigning CBP staff away from them, halted processing at seven POEs, returned asylum-seekers to Mexico, and failed to use all available detention space.

Critically, the focus of Ms. Hoffmann's requests centered on communications between CBP officials and Mr. Menchaca, with specific references to mobile phone communications and messages contained on the mobile phones of CBP officials.

Specifically, on February 21, 2019, Ms. Hoffmann sought:

a. Any and all correspondence and/or record of communications between CBP agents or employees and Hector Menchaca.

b. Any and all correspondence and/or record of communications between CBP agents or employees and the telephone number +52-878-703-2497.

c. Any and all communications relating to the capacity of CBP to accept asylum seekers for processing at the Eagle Pass POE from January 1, 2019 to the present.

d. Any and all internal or external CBP communications regarding a list of migrants awaiting their turn to present themselves at the Eagle Pass POE from January 1, 2019.

e. Any and all internal or external CBP communications regarding migrants detained in Piedras Negras, Mexico, from January 1, 2019 to the present.

Ms. Hoffman also expressed to CBP that agents' mobile devices were likely sources of responsive records in the timeframe of her request. ECF No. 37-4. Specifically, in response to a CBP inquiry, she identified the mobile devices of Eagle Pass Port Director Paul Del Rincon and Assistant Port Director Pete Macias as likely sources of responsive records, as Mr. Del Rincon and Mr. Macias would have been likely to communicate with Mr. Menchaca "often using WhatsApp." *Id.*

In March and April 2024, after continuing its pattern of alleging complete production, only to "discover" additional responsive documents after plaintiff has identified obvious gaps in information or point on inconsistencies, CBP produced four new and unsworn declarations addressing the mobile devices of Port Director Paul Del Rincon and Assistant Port Director Peter Macias:

a. March18, 2024 Unsworn Declaration of Diane C. Bustos (ECF63-1);

b. March18, 2024 Unsworn Declaration of Alejo M. Guedea (ECF63-2);

c. March 18, 2024 Unsworn Declaration of Anniebeth Labiosa (ECF 63-3);

d. April 18, 2024 Supplemental Unsworn Declaration of Diane C. Bustos (ECF 63-4).

Ms. Bustos' declaration alleged her oversight of forensic searches started in July of 2023. ECF No. 63-1. It was in this declaration that plaintiff learned of a device issued to Assistant Port Director Macias that is unaccounted for, *Id.*, ¶¶10-11, and through this declaration CBP admits that "there are

4

several inactive devices that were assigned to Port Director Del Rincon and Assistant Port Director Macias that have been wiped and destroyed." *Id.*, ¶12. Inexplicably, Ms. Bustos was "unable to identify anyone with personal knowledge" regarding ordering the destruction or wiping of the port directors' devices. *Id.*

Mr. Guedea's declaration described the multi-part documentation that is kept to track mobile devices issued to individuals like the port directors. ECF No. 63-2. Accordingly to Mr. Guedea's investigation, AT&T shows that Assistant Port Director Macias' cell phone number was assigned to a Samsung Galaxy S7 during the relevant time period. Id., ¶7. However, despite an "exhaustive search", no CBP tracking document can be found regarding the device. Putting aside AT&T's records, it is as if the device never existed. Id., ¶¶7-11.

Ms. Labiosa's declaration described searches of devices and sim cards that have nothing to do with the relevant time period. ECF 63-3. None of the devices identified in this declaration were issued to the port directors in 2019. This is confirmed in Ms. Bustos' supplemental declaration which admits that each device listed in the Labiosa declaration was issued two to five years after Ms. Hoffmann's FOIA request. ECF No. 63-4.

The critical admissions come in Ms. Bustos' supplemental declaration, and are contained within paragraphs 6, 7, and 8.

ECF No. 63-4, ¶6:

> 6. Based on information collected from CBP personnel, during the relevant time period (January 1, 2019 to February 21, 2019), PD Del Rincon was assigned a Galaxy S-7 which was assigned on 8/6/2018, returned on 11/16/21, and destroyed on 2/18/22.

<u>CBP admits that it destroyed the mobile phone device assigned to Port Director Del Rincon three years after Ms. Hoffmann's FOIA request and ten months after her April 9, 2021 email directly</u>

5

raising the port directors' devices as sources of responsive records. Ms. Bustos further confirms that Port Director Del Rincon continued to possess this device through November 16, 2021 – a full seven months after Ms. Hoffmann asked CBP to specifically search for information on his mobile phone. ENF No. 63-4, ¶¶7-8:

> 7. Based on information collected from CBP personnel, during the relevant time period (January 1, 2019 to February 21, 2019), APD Macias was assigned a Galaxy S-7 with an International Mobile Equipment Identity (IMEI) number of 35947007358706. As noted in my prior declaration, I have worked closely with Mission Support Specialist (MSS) Alejo Guedea, Eagle Pass POE, to locate records concerning the mobile device assigned to APD Macias during the relevant time period. The process to locate this inactive mobile device is set forth in Mr. Gudea's accompanying declaration. *See* Unsworn Declaration of Alejo M. Guedea at ¶¶ 7-9.
>
> 8. According to LPO Guedea, FirstNet, an AT&T partner, advised him that there was no activity for the Galaxy S-7 with an IMEI number of 35947007358706 other than in June 2020. LPO Guedea informed me that the fact that there was no usage other than in June, 2020 indicates that the mobile device had no activity, and therefore was not used by APD Macias. CBP has requested additional information from AT&T and its partner to see if it is possible to identify a mobile device used by APD Macias during the relevant period. We will advise you if we receive new information.

In updated declarations, Port Director Del Rincon admits that his mobile device, which was unquestionably identified a source of records responsive to Ms. Hoffmann's requests since 2019, was destroyed on February 18, 2022. ECF 70-13. Assistant Port Director Maciias, in his *unsigned* declaration, states that he has no information about the disposition of the device assigned to him during the relevant time period. ECF 70-14.

6

## III. ARGUMENT

CBP's motion for summary judgment should be denied because the agency fails to establish a *prima facie* case that it has conducted an adequate search. "Under the FOIA, an agency has the duty to conduct a reasonable search for responsive records." *Abdelfattah v. Dep't of Homeland Security*, 488 F.3d 178, 182 (3d Cir. 2007). CBP bears the burden of showing "beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents." *Wadhwa v. Dep't of Veterans Affs.*, 446 F. App'x 516, 520 (3d Cir. 2011) (quoting Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). Accord *Abdelfattah*, 488 F.3d at 182 (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999) as the standard for evaluating the sufficiency of agency affidavits in establishing search adequacy). Because "the fundamental principle animating FOIA is public access to government documents," agencies responding to FOIA requests must "make more than perfunctory searches and, indeed, follow through on obvious leads to discover requested documents." *Valencia-Lucena*, 180 F.3d at 325. The agency "cannot limit its search" to one or more places if there are additional sources that are likely to turn up the information requested." Id. (quoting *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

**CBP cannot show it acted reasonably it its search of devices it lost or intentionally destroyed during this litigation.**

A central premise of FOIA litigation is that records, or devices reasonably likely to contain records, are to be preserved and not destroyed while a FOIA request is pending and unresolved.

### 36 C.F.R. § 1230.3

. . . *Unlawful or accidental destruction (also called unauthorized destruction)* means disposal of an unscheduled or permanent record; disposal prior to the end of the NARA-approved retention period of a temporary record (other than court-ordered disposal . . . ); and disposal of a record subject to a FOIA request, litigation hold, or any other hold requirement to retain the records.

CBP alleges, in its motion for summary judgment, that it has met its burden of making reasonable attempts to comply with Ms. Hoffmann's FOIA requests because, as to the mobile devices of Port Directors Del Rincon and Macias, "it was not possible to conduct searches of those devices." ECF 70, at 6. This statement boldly ignores the fact that it was possible to search these devices while they still existed.

CBP was made aware of Ms. Hoffmann's request in February 2019. It knew that Port Directors Del Rincon's and Macias' mobile devices were sources of likely responsive records. Based on the declarations of its own witnesses, CBP permitted at least one of these phones to remain in the Port Director's possession during this litigation, and then, after being specifically asked to search these devices, destroyed or lost the devices.

CBP cannot demonstrate that it acted reasonably in conducting its searches when it violated the law in destroying the very sources of responsive records it was asked to search.

**CBP's established pattern of non-compliance demonstrates that the adequacy of its efforts has been unreasonable.**

Throughout this litigation, CBP has engaged in a consistent pattern of alleging full compliance with Ms. Hoffmann's request—even making this argument in a prior motion for summary judgment—only to later locate and produce significant amounts of new records when compelled to do so.

Now, after again being ordered to search obvious sources of responsive records, the balance of CBP's argument is not that it has produced all responsive records, but rather that the burden for conducting such a search is too great because the responsive is voluminous. ECF 70, at 5.

Because the agency has repeatedly failed to meet its burden of showing it complied with FOIA in tasking searches responsive to Plaintiff's request, genuine issues of material fact exist precluding judgment in the agency's favor. As with the missing or destroyed phones, CBP cannot claim it has acted reasonably by hiding behind a problem of its own creation.

8

## IV. Conclusion

Plaintiff requests that the Court deny defendant's motion for summary judgment in its entirety.

Respectfully,

/s /ADAM SNYDER

Counsel for Plaintiff
The Goodman Theater Building
60 W. Randolph St., Suite 400
Chicago, Illinois 60601